Andre Lee WILSON, Appellant,

v.

STATE of Texas, Appellee.

Nos. 11–96–367–CR to 11–96–371–CR.

Court of Appeals of Texas, Eastland.

May 22, 1997.

---

22 

John H. Hagler, Dallas, for appellant.

John C. Vance, District Attorney, Sue Koroith, Frank Crowley, Dallas, for appellee.

Before ARNOT, C.J., DICKENSON, J., and McCLOUD, Senior Justice.*

* Austin McCloud, Retired Chief Justice, Court of Appeals, 11th District of Texas at Eastland sitting by assignment.

McCLOUD, Senior Justice.

The jury found appellant, Andre Lee Wilson, guilty of capital murder,[1] aggravated robbery,[2] and three aggravated assaults.[3] The trial court set appellant's punishment at confinement for life for the capital murder conviction, confinement for 40 years for the aggravated robbery conviction, and confinement for 20 years for each of the aggravated assault convictions. We affirm each conviction.

Appellant was jointly tried with three other codefendants[4] who the record shows participated with appellant in a crime spree during the early morning hours of November 6, 1994. Each of the four defendants signed a written statement describing the various crimes that were committed and the role of individual parties. In each statement, the trial court required the names of the other codefendants to be edited or redacted by replacing the names of the codefendants with the word "guy." None of the defendants testified at trial. The State introduced into evidence the redacted written statement of each defendant. See *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). The court instructed the jury that they must not consider the confessions of the other three codefendants in any way as any evidence against appellant.

■ Appellant urges in his first and second points of error that the evidence is legally or, alternatively, factually insufficient to support the capital murder conviction. Appellant specifically challenges the finding that he "intentionally" caused the victim's death.

In considering appellant's legally insufficient challenge, we view all the evidence in the light most favorable to the jury's verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Geesa v. State,* 820 S.W.2d 154, 161 (Tex.Cr.App.1991).

In considering appellant's factually insufficient challenge, we must view all the evidence without the prism of "in the light most favorable to the prosecution" and set aside the verdict if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State,* 922 S.W.2d 126 (Tex.Cr.App.1996).

Appellant stated in his redacted confession:

> We rode around and saw a black car in a car wash. We saw the headlights on the car. It was an expensive car, so we thought he had some money. A guy drove into the car wash. I had the .410 and he had the SKS. I had a bag of shotgun shells in our car that I had been re-loading from all night. I came up from the back and he came up from the front of the black car. The white guy was washing his car. The guy saw us and sprayed me in my face with the soap he was washing his car with. That is when I shot at him once. Then I jumped behind the wall. I heard the guy shoot his SKS once. We hopped back in the car and took off.[5]

Before the murder victim died, he told an investigating officer that he had been shot by two men in the car wash and that the men had a rifle and a shotgun.

James R. Vineyard, a physical evidence investigator, testified that, in the third stall of the car wash, he observed blood, a .410 shotgun wadding, and a 7.62 cartridge casing which was manufactured in China.

Dr. Juan Luis Zamora, a Dallas County Medical Examiner who performed the autopsy on the deceased, described a "shotgun"

---

1. Cause No. 11–96–367–CR.

2. Cause No. 11–96–370–CR.

3. Cause Nos. 11–96–368–CR, 11–96–369–CR, and 11–96–371–CR.

4. Carlton Dewayne Lacy, Avery Cooke, and Randy Joshua Jones. We have on this date in separate opinions affirmed the convictions of the other codefendants.

5. When the four defendants were arrested, the officers found a .410 sawed-off shotgun and a 7.62 caliber SKS Chinese assault rifle in the Chevrolet Cavalier. The shotgun had a spent shell casing in its chamber. The SKS had a cartridge in the chamber and three additional live rounds in the magazine. A compact disc player was found underneath the front seat of the vehicle.

wound to the victim's right arm and shoulder and two "gunshot" wounds to the deceased's right and left thighs. Dr. Zamora testified that, in his opinion, the victim died from the shotgun wound and the gunshot wound to the right thigh.[6]

In describing the aggravated robbery which occurred shortly before the murder, appellant stated in the written confession that he shot the shotgun at the robbery victim's car. Appellant stated that the car stopped and that one of his "homeboys" grabbed the victims and threw them to the ground. While they were on the ground, appellant took the "C.D. Player" from the dash. Appellant stated that his "homeboys" took about $70 from the robbery victims. Appellant also admitted, in his written statement, to shooting the shotgun at another car and at a Bronco during the shooting, robbing, and assaulting spree.

Jose Luis Guadalajara testified that, during the early morning hours of November 6, 1994, while he and his girlfriend were parked in his truck at White Rock Lake, four young males attacked them and stole his compact disc player and approximately $90 from his billfold. One of the group shot the window of the truck, and Guadalajara was struck in the neck and shoulder. Guadalajara saw a shotgun, and he stated that the four youths were working together. Guadalajara's girlfriend testified that, when she told the robbers that she did not have a purse, they struck her in the face and talked about killing them.

Robert Michael Pederson testified that appellant shot at Pederson's windshield with a sawed-off shotgun as Pederson attempted to flee from the youths. Glass exploded, causing injury to Pederson and his date.

Several occupants of a Blazer described how they were chased by four youths in a Chevrolet Cavalier. Appellant was identified as one of the youths. During the chase, one of the occupants of the Cavalier shot at the Blazer, and the dashboard of the Blazer was shattered.

The evidence of the night's crime spree provided the context in which the murder occurred. *Lawton v. State*, 913 S.W.2d 542 (Tex.Cr.App.1995). A defendant's intent can be inferred from his words, acts, and conduct. *Dues v. State*, 634 S.W.2d 304 (Tex. Cr.App.1982). In determining culpability, the jury is entitled to consider events occurring before, during, and after the commission of an offense. *Barron v. State*, 566 S.W.2d 929, 931 (Tex.Cr.App.1978). A specific intent to kill may be inferred from the use of a deadly weapon per se. *Moreno v. State*, 755 S.W.2d 866 (Tex.Cr.App.1988). A sawed-off shotgun is a deadly weapon per se. TEX.PENAL CODE ANN. § 1.07(a)(17)(A) (Vernon 1994). Police Officer M.A. Casteel testified that sawing off a shotgun makes it smaller and easier to conceal and allows the shot to cover a broader area. The officer stated that sawed-off shotguns are only used to commit robberies and things of that sort. The use of a deadly weapon implies the specific intent to kill unless, in the manner of its use, it is reasonably apparent that death or serious bodily injury could not result. *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Cr.App.1986). The intent to kill may be inferred from the nature of the injury inflicted and flight from the scene. *Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex.Cr.App.1994).

The jury could properly infer that appellant, who had been involved in a crime spree of shootings, assaults, and robberies just prior to the murder, intended to kill the victim. Appellant shot the victim with a sawed-off shotgun while attempting to rob the victim. Appellant stated that he came up on the victim from the back and a "guy" with the "SKS" came up from the front. Appellant heard the "guy" shoot the "SKS." Appellant stated that, after the victim was shot, "We hopped back in the car and took off." The jury was free to reject appellant's contention that he merely shot the victim in response to the victim spraying him with the water hose at the car wash. We hold that the evidence was both legally and factually sufficient to support the jury's finding that appellant in-

6. The State mischaracterizes Dr. Zamora's testimony regarding the deceased's wounds. The State contends that Dr. Zamora testified that the deceased had a "shotgun" wound to the right shoulder and arm and a "shotgun" wound to the right thigh. The State erroneously maintains that Dr. Zamora testified that the deceased died from the two "shotgun" wounds.

tended to kill the victim. Appellant's Points of Error Nos. 1 and 2 are overruled.

In his third point of error, appellant maintains that the trial court erred in not including in the court's charge appellant's requested charge on the lesser included offense of manslaughter.

A person commits manslaughter if he "recklessly" causes the death of an individual. TEX.PENAL CODE ANN. § 19.04(a) (Vernon 1994). A person acts recklessly when he is aware of, but consciously disregards, a substantial and unjustifiable risk that the result will occur. See TEX.PENAL CODE ANN. § 6.03(c) (Vernon 1994). A charge on a lesser included offense is required if the two-prong test in *Rousseau v. State*, 855 S.W.2d 666 (Tex.Cr.App.1993), is met:

> [1] the lesser included offense must be included within the proof necessary to establish the offense charged; and

> [2] some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense.

Appellant argues that he satisfied the *Rousseau* test when he stated in his written confession that he shot the victim when the victim "saw us and sprayed me in my face with the soap he was washing his car with." A statement made by a defendant "cannot be plucked out of the record and examined in a vacuum." *Ramos v. State*, 865 S.W.2d 463 (Tex.Cr.App.1993). Implicit in the definition of manslaughter is that the defendant did not intend the resulting death or was not aware that death was reasonably certain to occur. *Burnett v. State*, 865 S.W.2d 223 (Tex.App.—San Antonio 1993, pet'n ref'd). Here, appellant was carrying a sawed-off shotgun, and his codefendant was carrying an assault rifle. They stalked an innocent victim who was washing his car. They thought the victim had some money because he had an expensive car. Appellant shot the victim once with the shotgun, and appellant's codefendant shot the victim twice with the assault rifle. The record contains no evidence that appellant only "recklessly" caused the victim's death. *Jones v. State*, 900 S.W.2d 103 (Tex.

App.—Houston [14th Dist.] 1995, no pet'n), cited by appellant, is distinguishable. There, the defendant and the deceased were drinking together, and they got into an argument. The defendant testified that, while he and the deceased were wrestling over a gun, it went off. Moreover, the defendant in *Jones* stated in his written statement that he did not intend to kill the deceased. There is no similar evidence in this case. There is no evidence in this record that appellant did not intend to kill the deceased. Appellant's third point of error is overruled.

In his fourth and fifth points of error, appellant contends that the trial court erred in admitting into evidence his written statement. When it was learned on early Sunday morning, shortly after the defendants had been arrested, that appellant was 16 years old, Kenneth Penrod, a homicide detective with the Dallas Police Department, telephoned Judge Harold Entz, Judge of the 194th District Court, and asked Judge Entz if he could come to the Dallas Police Department and give the proper warnings to appellant. Judge Entz testified that he went to the police department where he was met by a clerk in the "Crimes Against Persons section" who "ushered [him] into another room" and introduced him to appellant. The witnesses apparently referred to the crimes against persons section as the "CAPERS" office. The record reveals that Judge Entz very carefully and fully explained the statutory warnings that were given to appellant. The substance of the warnings and the voluntariness of appellant's statement are not in issue.

The contention raised by appellant in his fifth point is that the warnings and statement did not take place in a designated "juvenile processing office." TEX.FAM. CODE ANN. § 52.025 (Vernon 1996) provides in part:

> (a) The juvenile court may designate an office or a room, which may be located in a police facility or sheriff's offices, as the juvenile processing office for the temporary detention of a child taken into custody under Section 52.01 of this code.... The juvenile court by written order may prescribe the conditions of the designation

and limit the activities that may occur in the office during the temporary detention.

(b) A child may be detained in a juvenile processing office only for:

(4) the issuance of warnings to the child as required or permitted by this title; or

(5) the receipt of a statement by the child under Section 51.09(b) of this code.

Appellant contends that the warnings were given by Judge Entz and the written statement was signed by appellant at CAPERS rather than at the designated "juvenile processing office" as required by Section 52.025. Judge Entz testified on cross-examination that he gave appellant the statutory warnings and that appellant signed the written statement at CAPERS. Judge Entz stated:

Q: But the times that you went to see him, that was specifically at CAPERS; is that right?

A: Correct.

Q: Do you know whether or not CAPERS is a designated—designated juvenile detention center in Dallas County?

A: I believe that it is, but I'm not positive of that.

\* \* \* \* \* \*

Q: And again, you do not have independent knowledge of whether or not the CAPERS where this statement was taken is a des—designated juvenile detention facility?

A: I recall in judicial meetings, we have discussed that, and it's my understanding—I believe it's Judge Janis Warder that made the determination or caused whatever steps needed to be taken to have it appropriately designated for purposes of a juvenile warning. But it's been a while and—and I may be mistaken on that—on that regard.

Q: Have you ever gone over to Harry Hines to the Youth Detention Center over there and taken statements over there?

A: I have not.

Q: Okay.

A: And this was not the first time that I have been—

Q: At CAPERS.

A: —at CAPERS for this purpose.

Officer Penrod testified that appellant was not taken to CAPERS and that the warnings were given and the statement signed at the designated juvenile processing office. On cross-examination, Officer Penrod testified:

Q: And were all the—were all the Defendants down taken to CAPERS or some of them taken down or anything like that?

A: All the Defendants were taken down to CAPERS, with the exception of the juvenile Defendant here, who was taken to the Youth Division.

Q: *Okay. So, it's your testimony that Andre Wilson was not taken to CAPERS and that he was taken to the Youth Division?*

A: *That's correct.*

Q: So, if somebody said anything different from that, that wouldn't be—you're sure that he went to the Youth Division; you're sure he didn't go to CAPERS?

A: Yes.

Q: *And would the reason be that you would take him to the Youth Division because that's a designated juvenile facility in Dallas County?*

A: *That's correct.*

Q: And that would be standard SOP to always take a juvenile—suspected juvenile in a criminal offense to there rather than to CAPERS, because CAPERS is not a designated juvenile facility; correct?

A: If they're—if they're a witness—or, if they're a witness in a case, then, of course, we—we bring them down to CAPERS. If they're a definite suspect in a case, then we do take them to the Youth Division.

Q: All right.

A: So, it depends on whether they're a witness or whether they're a suspect. And of course—

Q: At this—

A: —there are times when—when people are brought to CAPERS as a witness and it turns out during the course of the investigation that they changed to a Defendant. And at that time, they would be transferred back over to the Youth Division.

Q: And it wouldn't be correct or wouldn't—wouldn't be proper in trying to get a statement from a juvenile to take him to CAPERS, because it is not a designated juvenile facility; correct?

A: Right. We would not interview a Defendant in—in our office that was a juvenile that was a definite suspect.

[DEFENSE COUNSEL]: Okay.

THE COURT: *Well, were you there when Judge Entz interviewed this Defendant?*

THE WITNESS: *I was*—I contacted Judge Entz when he—when he came to our office and explained to him what the situation was. *Then, we went to another office which is over in the Youth Division, and then he had us bring the Defendant to that—to that office and—and the two witnesses, and then, of course, he asked us to leave.*

THE COURT: *How close is CAPERS from the Youth Division offices?*

THE WITNESS: One's on the second floor and the other one is on the third floor. Part of the juvenile officers are on the third floor and part of the juvenile officers are across the hall from our—from the CAPERS Division. So, it's just divided between across the hall; they have offices up there and also upstairs.

THE COURT: All right. Go ahead.

Q: [DEFENSE COUNSEL] So, CAPERS is on the third floor?

A: CAPERS is on the second floor.

Q: And the Youth Division is on the third floor?

A: Correct. (Emphasis added)

In holding that appellant's written statement was admissible, the trial court stated:

My ruling is that the proper procedures were followed; that the statement was given voluntarily without coercion; *that Judge Entz is not a police officer, doesn't work in the building down there and, quite frankly, the Court feels like he just didn't know where he was.* (Emphasis added)

The record supports the trial court's holding that Judge Entz gave the required warnings and that appellant signed the statement in a designated juvenile processing office. Appellant's fifth point is overruled.

 Appellant asserts in his fourth point that his confession should have been suppressed because he was not brought before an official designated by the juvenile court to decide whether the police should be allowed to interrogate him. At trial, appellant objected that no one contacted a "designated juvenile officer." We question whether appellant has perfected his complaint since the objection at trial is different from the complaint on appeal. *Sterling v. State,* 800 S.W.2d 513 (Tex.Cr.App.1990), *cert. den'd,* 501 U.S. 1213, 111 S.Ct. 2816, 115 L.Ed.2d 988 (1991). We will, however, in the interest of justice, address appellant's complaint.

Appellant cites *Comer v. State,* 776 S.W.2d 191 (Tex.Cr.App.1989), to support his argument that he was not taken before an official designated by the juvenile court. The court in *Comer* was construing TEX.FAM.CODE § 52.02(a) (1973) which, at that time, provided in part:

(a) A person taking a child into custody, *without unnecessary delay and without first taking the child elsewhere,* shall do one of the following:

(2) bring the child before the office or official designated by the juvenile court;

(3) bring the child to a detention facility designated by the juvenile court. (Emphasis added)

The *Comer* court noted that Section 52.02(a) required the officer taking a child into custody to bring the child before the office or official designated by the juvenile court. The arresting officers in *Comer* took the child to a justice of the peace who gave the juvenile the statutory warnings pursuant to TEX.FAM.CODE ANN. § 51.09(b)(1) (Vernon 1996). Following the warnings, the officers took the juvenile to the sheriff's department where the juvenile gave a full confession which was committed to writing. The officers then returned the juvenile to the home of the justice of the peace where the juvenile signed the confession. The Court of Criminal Appeals held that the juvenile's statement was inadmissible because the officers had not complied with Section 52.02(a). The court stated that the legislature intended

to restrict the involvement of law enforcement officers to the initial seizure and prompt release or commitment of the juvenile offender *in accordance with Section 52.02(a)*.

Following *Comer*, the legislature amended Section 52.02(a) and enacted Section 52.025. TEX.FAM.CODE ANN. § 52.02(a) (Vernon 1996) now provides and provided when the offenses were committed in this case:

(a) A person taking a child into custody, without unnecessary delay and without first taking the child *to any place other than a juvenile processing office designated under Section 52.025 of this code, shall do one of the following*:

(1) release the child to a parent, guardian, custodian of the child, or other responsible adult upon that person's promise to bring the child before the juvenile court as requested by the court;

(2) bring the child before the office or official designated by the juvenile court if there is probable cause to believe that the child engaged in delinquent conduct or conduct indicating a need for supervision;

(3) bring the child to a detention facility designated by the juvenile court;

(4) bring the child to a medical facility if the child is believed to suffer from a serious physical condition or illness that requires prompt treatment; or

(5) dispose of the case under Section 52.03 of this code. (Emphasis added)

In reaching its decision in *Comer*, the Court of Criminal Appeals cited with approval the comments and analysis of Professor Robert O. Dawson. See *Comer v. State*, supra at 193–194. We also agree with the analysis of Professor Dawson regarding the relationship between Sections 52.02(a) and 52.025. The following comments by Professor Dawson are instructive:

Juvenile Processing Office. In 1991, the legislature, in response to *Comer v. State* amended Section 52.02 and enacted Section 52.025 to authorize each juvenile court to designate a "juvenile processing office" for the warning, interrogation and other handling of juveniles. Section 52.02(a) was

amended to authorize police to take an arrested juvenile to "a juvenile processing office designated under Section 52.025 of this code."

\* \* \* \* \* \*

Apparently, only one "juvenile processing office" may be designated for each county, but it may be in a law enforcement facility. Until it is designated by the juvenile court, no county has a juvenile processing office. The designation creates that office and implements the provisions of Section 52.025.

It is the apparent purpose of this amendment to change *Comer v. State* to permit law enforcement facilities to be designated as places where children taken into custody can be taken for questioning. However, the amendment does not address the separate question whether permission of the juvenile court or its staff is required before police may conduct custodial interrogation in a "juvenile processing office." *In all likelihood, the legislature intended to authorize police to question without obtaining specific juvenile court or staff permission on a case-by-case basis.* However, it is also clear that a juvenile court, through its power under Section 52.025 to "prescribe the conditions of the designation and limit the activities that may occur in the office during the temporary detention," is empowered to require its or its staff's consent on a case-by-case basis in order for custodial interrogation to occur. *If the juvenile court does not impose such a restriction in its designation, then the statute itself most likely gives police the power to interrogate without obtaining specific permission from the court.* (Emphasis added)

ROBERT O. DAWSON, TEXAS JUVENILE LAW pp. 156–157 (3d ed. 1992).

The State proved that it complied with Sections 52.02(a) and 52.025. There was no evidence that the police officers at the juvenile processing office were required to get the permission of the juvenile court or juvenile probation office before the officers could interrogate appellant. Detective Penrod testified that "juvenile detectives" are assigned 24 hours a day to the youth division office

but that no juvenile probation officers are assigned to the juvenile processing office. He stated that they are not required to contact a juvenile "probation officer" when they arrest a juvenile and bring the juvenile to the youth division. There is no contrary evidence. Appellant's fourth point is overruled.

██ In his final point of error, appellant maintains that the admission of codefendant Lacy's oral statements, through the testimony of Officer Shawn Messick, violated appellant's confrontation rights under the sixth amendment to the U.S. Constitution.

Lacy's oral statements were put into evidence by Lacy during Lacy's cross-examination of Officer Messick. The officer redacted Lacy's oral statements by replacing the codefendants' names with the generic term "individuals." The court instructed the jury in the charge not to consider the other codefendants' confessions in determining appellant's guilt. This instruction applied to Lacy's oral confession as well as the written confessions of the other defendants.

██ The confrontation clause is not violated if the non-testifying codefendant's confession is edited or redacted to eliminate any reference to the other defendant and the jury is instructed not to consider the codefendant's confession in determining the other defendant's guilt. *Richardson v. Marsh, supra; Finley v. State,* 917 S.W.2d 122, 125 (Tex.App.—Austin 1996, pet'n ref'd); *Proctor v. State,* 871 S.W.2d 225, 230 (Tex.App.—Eastland 1993), *vacated and remanded on other grounds,* 915 S.W.2d 490 (Tex.Cr.App. 1995).

Appellant argues that Lacy's oral confession was inadmissible even though it was redacted because it inferentially implicated appellant in light of the other evidence admitted at trial. This argument was answered in *United States v. Williams,* 936 F.2d 698 (2nd Cir.1991), wherein the court stated:

> Since *Richardson,* we have on several occasions admitted redacted confessions in which names of codefendants were replaced by neutral pronouns and "where the statement standing alone does not other-

wise connect co-defendants to the crimes." These decisions have uniformly held that the appropriate analysis to be used when applying the *Bruton [v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)] rule requires that we view the redacted confession in isolation from the other evidence introduced at trial. If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant. This analysis is adopted directly from *Richardson* itself, and the principal extension of *Richardson* by our decisions is that they allow redacted confessions to refer to accomplices with neutral pronouns. (Citations omitted)

The *Williams* court recognized that the other evidence in the case, particularly the confession of Williams, indicated that the neutral pronoun in McKenzie's statement (the codefendant) referred to Williams. The court, however, held:

> The interlocking of the confessions thus all but insured that a jury *could* identify the person referred to in McKenzie's confession as Williams.... Nevertheless, a jury *would* identify Williams as the other "guy" in McKenzie's confession only if it disregarded the limiting instructions given by the district court. As noted, *Richardson* stated that where linkage to other evidence is necessary to connect the defendant to the crime described in a codefendant's confession, the likelihood that a jury will disregard such a limiting instruction is less than in a case such as *Bruton,* in which the codefendant's confession directly and expressly implicated the defendant. (Emphasis in original)

See also *United States v. Smith,* 46 F.3d 1223 (1st Cir.1995); *United States v. Restrepo,* 994 F.2d 173, 186 (5th Cir.1993); *United States v. Arias,* 984 F.2d 1139 (11th Cir. 1993); *United States v. Kelly,* 973 F.2d 1145, 1150 (5th Cir.1992).

Lacy's redacted oral statements using the generic term "individual" did not directly refer to or implicate appellant. Linkage to

**30**

other evidence was necessary to connect appellant to the crimes described in Lacy's confession. We will presume that the jury followed the court's instruction.

■ Moreover, we hold that, if the court erred in admitting Lacy's redacted oral statements, the error was harmless. Appellant admitted in his written confession that he shot, with the sawed-off shotgun, the victim at the car wash, who later died; that he shot at the victim of the aggravated robbery; and that he shot at two other vehicles. Appellant was identified in court by the robbery and assault victims. Four defendants were involved in these offenses, and the term "individual" in Lacy's redacted oral statements could have applied to any of the other codefendants, as well as to some unknown person. Declaring the error harmless will not encourage the State to repeat it with impunity. Lacy's redacted oral statements were put into evidence by Lacy, not by the State. *Harris v. State,* 790 S.W.2d 568, 587 (Tex.Cr. App.1989). Any error in admitting this evidence did not prejudice the jury's decision-making process. The evidence of appellant's guilt was overwhelming. The alleged error would not have disrupted the jury's orderly evaluation of the evidence. If the court committed error, we hold that, beyond a reasonable doubt, the error made no contribution to the conviction or to the punishment. TEX. R.APP.P. 81(b)(2). Appellant's sixth point is overruled.

We have considered all points of error in each of the convictions, and all points are overruled. The judgment of the trial court in each case is affirmed.