COURT OF APPEALS

















COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL PASO, TEXAS

 

ESEQUIEL RODARTE,                                       )

                                                                              )              
No.  08-04-00176-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                 
83rd District Court

THE STATE OF TEXAS,                                     )

                                                                              )            
of Pecos County, Texas

Appellee.                           )

                                                                              )         
(Pecos TC# P-2525-83-CR)

                                                                              )      
(Crockett TC# 03-12-2253-CR)

 

 

O
P I N I O N

 

Esequiel Rodarte
appeals his conviction for indecency with a child.  A jury found him guilty and he was sentenced
to 5 years=
imprisonment, probated to 4 years and a $10,000 fine.[1]  Appellant challenges:  (1) the trial court=s
ruling admitting out-of-court statements of the complainant as excited
utterances; (2) the trial court=s
ruling allowing a videotape of the victim=s
forensic interview to be admitted into evidence; (3) the trial court=s ruling admitting out-of-court
statements of the complainant as prior consistent statements; (4) the trial
court=s ruling
admitting evidence of a prior extraneous offense; (5) the transfer of venue on
the court=s own
motion; and (6) the legal and factual sufficiency of the evidence supporting
his conviction.  We affirm.








The complainant,
H.B., was a fourteen-year-old female at the time of the instant events.  Appellant was employed as an officer by the
Texas Department of Public Safety. 
Appellant began dating H.B.=s
mother when H.B. was about eight years old. 
They all lived together and another child was born of the
relationship.  Appellant and H.B.=s mother had set a wedding date for
September 15, 2001.

On September 10,
2001, Appellant picked H.B. up from school to take her to lunch.  As a result of an eye infection, H.B. did not
return to school that day.  After lunch,
Appellant asked H.B. if she wanted a massage. 
H.B. replied that she did because she had a headache caused by
allergies.  Appellant retrieved an
electric massager and proceeded to H.B.=s
bedroom to give her a massage.  H.B. laid
on her back and Appellant began to massage her head.  At some point during the massage, Appellant asked
H.B. to turn over on her stomach so he could massage her back.  Appellant lifted H.B.=s
shirt and began to message her back.  As
he massaged H.B.=s back,
he began to move towards H.B.=s
Abottom.@  H.B. stated that she started feeling Auncomfortable@
and Atensing
up@ at this point.  H.B. stated that Appellant left the massager
on her Abutt area@ and began to use his hands.

H.B. stated that
Appellant used his hands to massage the inside of her thighs.  She testified that A[Appellant]
was massaging me though the inside -- that was outside of my clothes, outside
of my bottom.  And then he put -- I just
felt his hand go down there.@  The State then asked H.B. specifically where
Appellant touched her.  H.B. replied that
Appellant touched her Aprivate
part.@  Upon further urging by the State, H.B.
identified Aprivate
part@ as her Avagina.@  The State later asked whether Appellant put
his hand under her clothes when he touched her vagina and H.B. indicated that
he did.








After the alleged
incident, Appellant tried to turn H.B. over on her back.  She then noticed that her bra was
unhooked.  Appellant left her room.  According to H.B., Appellant returned to her
room and asked her if he had Awent
too far.@  H.B. testified that she told Appellant that
he had gone too far and when she did so, Appellant grabbed his chest Alike he was having a heart attack@ and began to hit the walls begging her
not to tell anyone.  H.B. told Appellant
she would tell and told him to get out of her room.

At around 2:30
that afternoon, shortly after the alleged offense, H.B. attempted to call her
mother.  She first tried to use the
telephone in her bedroom but there was no dial tone.  She then went to the kitchen to use the
telephone located there.  Just as she
finished dialing her mother=s
number, Appellant came into the kitchen and told her to stop.  H.B. testified that when her mother came on
the line, she was crying and could only utter Amom.@ 
At this point, Appellant again told her not to tell her mother.  H.B. stated she told Appellant either A[y]ou tell her or I=ll tell her.@  Appellant then Agrabbed@ the phone from her.

Ms. Margarita
Velasquez, H.B.=s mother,
stated that when she received the call, H.B. was Acrying,
hysterical, couldn=t say
anything.@  Ms. Velasquez asked H.B. what was wrong but
H.B. just kept crying.  Ms. Velasquez
then spoke with Appellant.  According to
Ms. Velasquez, Appellant told her he had Amassaged
[H.B.] and he had gone -- she believed that he had gone too far.@ 
Ms. Velasquez asked Appellant if he had gone to far and he replied that
he had not.  After speaking with
Appellant, Ms. Velasquez decided to return to the family residence.








Approximately
thirty minutes after receiving the first call, H.B. again called her mother to
tell her not to drive too fast because she did not want her to get hurt.  According to H.B., Appellant told her that
her mother would hurry home and something would happen along the way and it
would be Aall her
fault.@  H.B. testified that when she spoke with her
mother the second time, she told her everything was Aokay@ and asked her to drive home slowly.

On her way home,
Ms. Velasquez first stopped off at the bank to deposit the money she had
collected in her position as drivers=
license examiner.  Then she drove to the
family=s church
looking for Father David Herrera.  When
she could not locate Father Herrera, she continued on to her house.  As she approached the home, Appellant stopped
her to retrieve a check from his check book which was located in her car.  Ms. Velasquez stated that Appellant was on
the way to pick up their younger daughter. 
Once inside the house, Ms. Velasquez went to her daughter=s room and asked her what had occurred
earlier in the afternoon.

According to Ms.
Velasquez, H.B. told her that Appellant first began massaging her legs,  then proceeded to massage her back.  H.B. told her that as Appellant was massaging
her back he started Arunning
his finger down to her buttocks, from her buttocks down to her vagina.@ 
She stated that H.B. also told her that Appellant had asked her Aif it feels good.@ 
H.B. told her that Appellant used his other hand to rub her breast.  Ms. Velasquez testified that when she asked
H.B. if it was the first time, H.B. Ashook
her head no.@  After speaking with H.B., Ms. Velasquez
waited for Appellant to return home so that she could speak to him about the
incident.  When Appellant returned, Ms.
Velasquez asked him what happened. 
Appellant replied that he massaged H.B.=s
legs and back because she was sore from athletics.








Ms. Velasquez
decided it would be best to have a professional=s
opinion and wanted to take H.B. to see Father Herrera.  Ms. Velasquez could not reach Father Herrera
so she, H.B., and her younger daughter drove over to Ms. Velasquez=s mother=s
home.  Ms. Velasquez and her daughters
soon left to find Father Herrera.  Ms.
Velasquez first looked for Father Herrera=s
home but could not locate it.  She then
stopped at the home of a deacon of the church to get Father Herrera=s address.  After getting his address, she drove to
Father Herrera=s home.

Father Herrera
testified that Ms. Velasquez and her daughters arrived at his residence at
approximately 8:30 p.m.  He stated that
when he first saw H.B., her mother was helping her walk.  As they approached his home, he opened the
front door to let them inside and they sat down on his couch.  Father Herrera asked H.B. what happened.  H.B. again retold the story of what had
happened to her earlier in the afternoon. 
Father Herrera asked H.B. if she wanted to report the incident and she
replied that she did.  Father Herrera
then called the Fort Stockton Police Department.

Approximately five
minutes after Father Herrera called the police department, Appellant arrived at
his home.  Appellant wanted to speak with
Ms. Velasquez and H.B.  Father Herrera
told Appellant that it was not a good idea and suggested they take a walk down
the street instead.  During the
conversation with Father Herrera, Appellant admitted that he had used the
massager underneath H.B.=s
shirt.  Appellant also demonstrated to
Father Herrera where he claimed he had touched H.B.  According to Father Herrera, Appellant
touched him two times, once on his back and once on his upper thigh, in order
to demonstrate the touching that Appellant claimed had occurred with H.B.  Shortly thereafter, police officers arrived
at Father Herrera=s home.








Officer Louis
Hernandez was one of the first officers to arrive at Father Herrera=s home. 
Approximately fifteen minutes after Officer Hernandez arrived on the
scene, the Chief of the Fort Stockton Police Department, Stephen Cantrell,
arrived and took over the investigation. 
Chief Cantrell called Child Protective Services to make arrangements for
H.B. to be interviewed by a caseworker. 
A caseworker was assigned and an interview scheduled for the following
day.  On September 11, 2001, Chief
Cantrell drove H.B. and her mother to the interview with her assigned
caseworker.  The interview was conducted
by Eve Flores at the Harmony Home Children=s
Advocacy Center
in Odessa, Texas. 
Ultimately, Texas Ranger David Hullum was assigned as the primary
investigator in the case.

At trial,
Appellant called several witnesses but did not testify in his own defense.  A mental health expert, Dr. Karen Gold,
testified on his behalf.  Dr. Gold
performed a Acomprehensive
sex offender/defendant evaluation@
of Appellant.  After her evaluation of
Appellant, Dr. Gold concluded that there were Ano
indications of any of the markers or indicators that we see that would suggest
pedophilia.@  After hearing all of the testimony, a jury
found Appellant guilty of the offense of indecency with a child.

Standards
of Review








We review a trial
court=s
decision to admit or exclude evidence under an abuse of discretion
standard.  Torres v. State, 71
S.W.3d 758, 760 (Tex.Crim.App. 2002).  An
abuse of discretion occurs when the trial court acts arbitrarily or
unreasonably, without reference to guiding rules or principles.   Montgomery v. State,
810 S.W.2d 372, 380 (Tex.Crim.App. 1990). We give the trial court wide
discretion and latitude in its decision and will not reverse an evidentiary
ruling as long as it is within the zone of reasonable disagreement.  Torres, 71 S.W.3d at 760.  A trial court=s
ruling on admissibility should not be disturbed under an abuse of discretion
standard simply because we might decide a question differently than the trial
judge.  West v. State, 121 S.W.3d
95, 100 (Tex.App.--Fort Worth 2003, pet. ref=d),
citing Montgomery,
810 S.W.2d at 391.  An appellate court
may uphold the trial court=s
ruling on the admission or exclusion of evidence on any legal theory or basis
applicable to the case.  Martinez v. State, 91 S.W.3d
331, 336 (Tex.Crim.App. 2002).

We review the
legal sufficiency of the evidence in the light most favorable to the verdict in
an effort to determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S.
307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); Hernandez v.
State, 946 S.W.2d 108, 110-11 (Tex.App.--El Paso 1997, no pet.).  We do not resolve any conflict of fact, weigh
any evidence, or evaluate the credibility of any witness, as this was the
function of the trier of fact.  See
Adelman v. State, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); Matson v.
State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991).  Instead, our duty is to determine if both the
explicit and implicit findings of the trier of fact are rational by viewing all
the evidence admitted at trial in the light most favorable to the verdict.  See Adelman, 828 S.W.2d at
421-22.  In so doing, any inconsistencies
in the evidence are resolved in favor of the verdict.  Matson, 819 S.W.2d at 843.

In reviewing the
factual sufficiency of the evidence, we must determine whether considering all
the evidence in a neutral light, the jury was rationally justified in finding
guilt beyond a reasonable doubt.  Zuniga
v. State, 144 S.W.3d 477, 484 (Tex.Crim.App. 2004).  Evidence can be factually insufficient if the
evidence supporting the verdict, considered by itself, is too weak to support
the finding of guilt beyond a reasonable doubt, or contrary evidence is so
strong that guilt cannot be proven beyond a reasonable doubt.  Id.
at 484-55.  Our evaluation should not
intrude upon the fact finder=s
role as the sole judge of the weight and credibility given to any witness=s testimony.  Cain v. State, 958 S.W.2d 404, 407
(Tex.Crim.App. 1997).  








We will not set
aside the judgment unless the evidence supporting the verdict is so weak as to
be clearly wrong and manifestly unjust.  Zuniga,
144 S.W.3d at 481.  A clearly wrong and
manifestly unjust verdict occurs where the jury=s
finding Ashocks
the conscience@ or Aclearly demonstrates bias.@ 
Zuniga, 144 S.W.3d at 481. 
An opinion addressing factual sufficiency must include a discussion of
the most important and relevant evidence that supports the Appellant=s complaint on appeal.  Sims v. State, 99 S.W.3d 600, 603
(Tex.Crim.App. 2003).

DISCUSSION

A person commits
the offense of indecency with a child if he engages in sexual contact 

with a child younger than 17 years
old.  See Tex.Penal Code Ann. '
21.11(a)(1)(Vernon 2003).  ASexual contact@
is defined to include any touching of the breast or any part of the genitals of
a person with intent to arouse or gratify the sexual desire of any person.  See Tex.Penal
Code Ann. '
21.01(2).

In his first
issue, Appellant argues that the trial court erred by ruling that the victim=s out-of-court statements to Father
Herrera and H.B.=s mother
were admissible as exceptions to the hearsay rule because they were excited
utterances.  The State points out that
Appellant=s first
issue is multifarious in that it embraces more than one issue and attacks
several distinct trial court rulings.  See,
e.g., Newby v. State, 169 S.W.3d 413, 414 (Tex.App.‑-Texarkana
2005, no pet.).  Although we are not
required to, we may address Appellant=s
complaint if it is sufficiently developed in the brief.  Foster v. State, 101 S.W.3d 490, 499
(Tex.App.-‑Houston [1st Dist.] 2002, no pet.).  Accordingly, in the interest of justice, we
will address the statements of H.B. to both her mother and Father Herrera.  See Sterling
v. State, 800 S.W.2d 513, 521 (Tex.Crim.App. 1990).








The State
maintains that the specifically challenged statements were admissible as
excited utterances.  An excited utterance
is an exception to the rule prohibiting hearsay statements from being admitted
as evidence.  See Tex.R.Evid. 803(2).  The excited utterance hearsay exception
permits admission of a hearsay statement Arelating
to a startling event or condition made while the declarant was under the stress
of excitement caused by the event or condition.@  Tex.R.Evid.
803(2); Arzaga v. State, 86 S.W.3d 767, 775 (Tex.App.‑-El Paso
2002, no pet.).

This exception
derives from the belief that such statements are trustworthy, because they are
involuntary and do not allow the declarant a sufficient opportunity to
fabricate.  Zuliani v. State, 97
S.W.3d 589, 595 (Tex.Crim.App. 2003); Gutierrez v. State, 85 S.W.3d 446,
455 (Tex.App.‑-Austin 2002, pet. ref'd). 
For a statement to qualify as an excited utterance:  (1) the statement must be the product of a
startling occurrence; (2) the declarent must have been dominated by the
emotion, excitement, fear, or pain of the occurrence; and (3) the statement
must be related to the circumstances of the startling occurrence.  Gutierrez, 85 S.W.3d at 455.








The excited
utterances exception was intended to be flexible and no single rigid principle
governs the admissibility of statements under the rule.  Bondurant v. State, 956 S.W.2d 762,
765 (Tex.App.‑-Fort Worth 1997, pet. ref'd).  Instead, each case must be considered on its
own particular facts.  Arzaga, 86
S.W.3d at 775-76.  AThe exception is based on the
assumption that the declarant is not, at the time of the statement, capable of
the kind of reflection that would enable [her] to fabricate information.@ 
Apolinar v. State, 155 S.W.3d 184, 186 (Tex.Crim.App. 2005), citing
Zuliani, 97 S.W.3d at 595.  In
deciding if a declarant is still dominated by her emotions from viewing or
experiencing the startling event, the trial court may consider the following
factors:  (1) the length of time between
the event or condition and the statement; (2) the nature of the declarant; (3)
whether the statement is made in response to a question; and (4) whether the
statement is self‑serving.  See
Apolinar, 155 S.W.3d at 187, citing Zuliani, 97 S.W.3d at 595‑96.

It is not
dispositive that the statement is an answer to a question or that it was
separated by a period of time from the startling event, although these are
among the factors to be considered in deciding whether a statement is
admissible under the exception.  Salazar
v. State, 38 S.W.3d 141, 154 (Tex.Crim.App. 2001).  AThe
critical determination is >whether
the declarant was still dominated by the emotions, excitement, fear, or pain of
the event= or
condition at the time of the statement.@  Id.,
citing McFarland v. State, 845 S.W.2d 824, 846 (Tex.Crim.App. 1992).

With regard to
statements H.B. made to her mother, these statements were made approximately
two to two and one-half hours after the alleged incident.[2]  According to H.B., after Appellant touched
her, he left her room.  H.B. testified
that when she tried to use the phone next to her bed, there was no dial
tone.  H.B. stated that when she
discovered there was no dial tone, A[she]
got scared. [She] was thinking, >Do
I go out the window?=  [She] didn=t
know what to do.@  H.B. then went to the kitchen to dial her
mother=s
number.  As she was dialing the number,
Appellant came into the room and told her to stop but her mother was already on
the phone.








H.B. stated that
as she was trying to talk to her mother on the phone, she kept Acrying and crying@ and could only utter Amom.@  H.B. testified that Appellant came into the
room and told her not to tell her mother anything.  H.B. stated that after the phone call to her mother,
she went to her bedroom.  She testified
that she did not have a lock on her door so she was Ascared.@ 
H.B. also stated that after she called her mother, she went to her room
and tried to fall asleep.  During the
intervening period between the event and the arrival of her mother, Appellant
remained in the home with her.  Shortly
before H.B.=s mother
arrived, Appellant left to pick up H.B.=s
younger sister from day care.

Ms. Velasquez
testified that when H.B. called her, she was Acrying,
hysterical, couldn=t say
anything.@  Ms. Velasquez stated that while on the phone,
she asked H.B. what was wrong but she just kept crying.  When asked about her emotional state, Ms.
Velasquez stated that she sounded Ahysterical.@ 
She also testified that H.B. sounded like she was Aupset, she was hysterical, she was
crying; but her crying was like she was hollering for help.@ 
Ms. Velasquez stated that when she arrived home, she proceeded to H.B.=s room. 
She stated that the door to H.B.=s
room was locked.  Ms. Velasquez testified
that H.B.=s eyes
were swollen from crying.  Additionally,
she stated that H.B. Astill
had tears in her eyes.@  Ms. Valesquez entered H.B.=s room and sat on the edge of her
bed.  She then asked H.B. what had
occurred.  In response, H.B. told her
what had transpired earlier.

We note that when
H.B. made the statements to her mother at least two hours had passed since the
alleged incident and the statements were made in response to questioning.  However, H.B. was also a fourteen-year-old
child at the time of the incident.  After
considering the statements in light of the relevant factors, we find that the
evidence as a whole is adequate to support the finding that H.B. was still
under the emotional and physical stress of the assault.  Thus, the trial court did not abuse its
discretion in allowing the out-of-court statements made to Ms. Velasquez into
evidence under the excited utterance exception.








We next turn to
the statements H.B. made to Father Herrera.[3]  The State admits in its brief that Athe question of whether [H.B.=s] statements to Father David were
excited utterances is a closer call than that regarding the statements she made
to her mother earlier.@  Appellant argues that H.B. was Ano longer dominated by the emotions of
excitement, fear, or pain of the alleged sexual contact during her conversation
with Father Herrera.@  As support, Appellant points to the fact that
shortly after the alleged event occured, A[H.B.]
had the presence of mind to call her mother . . . and tell her to slow down,
not to drive too fast.@  We point out that H.B. was prompted to call
her mother a second time in response to Appellant telling her that if something
happened to her mother on the drive home it would be her fault.

Appellant also
points to the fact that while waiting for Father Herrera at her grandmother=s home, H.B. Asat
and watched television, flipping through the channels@
and Aacted so
normal that her grandmother never realized something traumatic had happened to
her granddaughter.@  According to Ms. Velasquez, she and her
daughters went to her mother=s
home because she had planned to dye her mother=s
hair for the upcoming wedding.  Because
of her mother=s health
conditions which included sugar diabetes, high blood pressure, and on one
occasion, a nervous breakdown, Ms. Velasquez did not want her to know anything
had occurred.  Ms. Velasquez testified
that while at her mother=s
home, H.B. flipped through channels Alike
she was in a daze.@  After spending approximately thirty minutes
at her mother=s house,
Ms. Velasquez and her daughters left in order to find Father Herrera.  








Appellant also
argues that H.B. was Aout
of Appellant=s control
and domination for a considerable amount of time prior to talking to Father
Herrera@ and thus
no longer within Appellant=s
Azone of control.@  However, Father Herrera testified that Ms.
Valesquez and H.B. arrived at his home at approximately 8:30 p.m., some six
hours after the alleged incident.  He
stated that when he first saw H.B., her mother was A[s]upporting
her.  Helping her walk.@ 
Father Herrera stated that H.B. had a Arunny
nose, sniffling, caused by the crying.@  He testified that at times when H.B. was
telling him what had happened, he could not understand what she was saying and
had to ask her to repeat herself.  On
cross-examination, Father Herrera stated that H.B. Awas
very distraught, very emotional, to the point that the mother was offering
comfort and support bringing her into my house.@

Considering the
testimony in light of the surrounding circumstances, we conclude that the trial
judge=s
decision to admit the complained-of evidence was not so clearly wrong as to lie
outside that zone within which reasonable persons might disagree.  See Zuliani, 97 S.W.3d at 595-96.  Therefore, the trial court did not abuse its
discretion in allowing the out-of-court statements made to Father Herrera to be
admitted into evidence under the exception for excited utterances.  Issue One is overruled.








In Issue Two,
Appellant argues that the trial court abused its discretion when it granted the
State=s request
under Tex.R.Evid. 107 to
introduce a videotape of the forensic interview of H.B. conducted by Eve
Flores.  He first argues that the State
was the proponent of the videotape and cannot rely on the rule of optional
completeness to admit the videotape into evidence.  We agree that a party cannot open the door
and then rely upon the rule of optional completeness to then pursue an improper
line of questioning.  West v. State,
121 S.W.3d 95, 103 (Tex.App.--Fort Worth 2003, pet. ref=d).  However, merely referring to an act,
declaration, conversation, writing, or recorded statement does not invoke the
rule of optional completeness.  See
Goldberg v. State, 95 S.W.3d 345, 386-87 (Tex.App.‑-Houston [1st
Dist.] 2002, pet. ref=d).

The rule is not
implicated until a party attempts to have a portion of an act, declaration,
conversation, writing, or recorded statement given into evidence.  See Sauceda v. State, 129 S.W.3d 116,
122 (Tex.Crim.App. 2004).  When an
opposing party thus makes the attempt to have portions of an act, declaration,
conversation, writing, or recorded statement given into evidence, the adverse
party is entitled to introduce into evidence the remaining portions of the same
necessary to a full understanding of the evidence.  Id.  After reviewing the record it is clear that
while the State did refer to the existence of the videotape, at no time
did the State inquire into the substance of what was contained on the
videotape.[4]








During the
cross-examination of the defense expert Dr. Karen Gold, the State inquired into
the existence of the videotape by first asking her if she had received the
videotape.  Dr. Gold answered that she
had not.  On at least two occasions, the
State pointed out that Dr. Gold had not watched the videotaped interview of
H.B.  After a break for lunch, the
cross-examination of Dr. Gold resumed. 
The State again pointed out that Dr. Gold had not reviewed the
videotape.  However, on this occasion Dr.
Gold informed the State that she had reviewed the videotape during the lunch
recess.  The State asked only if watching
the video had Ashed any
light on anything@ and Dr.
Gold replied that it had.  The State did
not ask Dr. Gold any further questions regarding the videotape.

It was not until
redirect by Appellant that substantive matters contained on the videotape were
raised.  Appellant delved into the
substance of the videotape by asking specific questions concerning specific
statements made by H.B. during the interview as recorded on the videotape.  The following exchange occurred between
counsel for Appellant and Dr. Gold:

Q:        [T]oday at lunch, if you saw any further
inconsistencies in [H.B.=s]
statement to law enforcement personnel, ma=am.

 

A:         Yes.

 

Q:        What were they?

 

A:         The videotape was quite confusing --

 

Q:        In what way?

 

A:         Miss Flores asked her twice if anything
like that had ever happened before, and twice she said no.  She said at one -- she used a lot of
different verbs, that he -- at one -- she used a lot of different verbs, that
he --

 

Q:        Pertaining to what?

 

A:         To how she was -- inappropriately >touched=
was one of the words she used; that she was touched, she --

 

Q:        >Touched= meaning the plural sense?  One touching or touched several times:

 

A:         There was one touch, there was a rub,
there was a stroke, there was a pressure on her breast.  There were a lot of different things that she
mentioned.  She said that it never happened
before on two occasions.  She said it was
over her pants, under her underwear, over her underwear during the course of
the tape.  And she also said that he
touched her vagina privates (sic) with the massager.  So there were a lot of different things in
the videotape, and it was very hard to see consistency.  There was none, that I could follow.








Q:        And when you allude to the stroke part
-- what was he stroking?  Did she say on
the tape?

 

A:         Sometimes it was her butt; sometimes it
was her back; sometimes it was her head. 
There was a stroke -- he touched her -- the top of her vagina private
(sic) one time, she said.  It was -- it
was very difficult.  It was about an
hour-long tape, and there were many different allegations throughout the tape.

 

Q:        So she was in effect, in your opinion,
giving different versions of one allegation?

 

A:         I don=t
know what she -- I really am not sure. 
She said that she was crying and crying, and crying, and then she said
she was pretending to be asleep so that he would leave.  I don=t
know.

 

Q:        Well, now, tell us:  Based upon your experience -- and I mean
common sense, too -- can you play like you=re
asleep and cry at the same time?

 

A:         Well, she didn=t
say that she was pretending to be asleep and crying at the same time.  It was that some of the time she was crying
and crying and crying and some of the time she was pretending to be asleep, by
her report in the videotape.

 

During the State=s rebuttal, the State called Eve Flores
from Harmony Home to the stand.  After
laying the predicate, the State sought to introduce the videotape into evidence
under the rule of optional completeness. 
By inquiring into substantive statements made by H.B. throughout the
videotape, Appellant opened the door and thus the trial court did not abuse its
discretion in admitting the videotape of the forensic interview to be
introduced into evidence.  

Additionally,
Appellant argues that even if the videotape was given into evidence by
Appellant, Asuch
event did not require the automatic admission of the entire Video Tape.@ 
By challenging the credibility of H.B. using specific statements
contained on the videotape, the entire tape was admissible.  See Credille v. State, 925 S.W.2d 112,
116 (Tex.App.-‑Houston [14th Dist.] 1996, pet. ref'd).  Issue Two is overruled.








In Issue Three,
Appellant argues that the trial court erred in determining that the
out-of-court statements made to Texas Ranger David Hullum, the primary
investigator assigned to the case, qualified as prior consistent statements.  Prior consistent statements of a witness
which are consistent with the testimony presented at trial are generally
inadmissible.  However, prior consistent
statements may be introduced if:  (1) the
declarant testifies at the trial and is subject to cross-examination concerning
the statement; (2) the statement is consistent with the declarant=s testimony; and (3) the statement is
offered to rebut an express or implied charge against the declarant of recent
fabrication or improper influence or motive. 
Tex.R. Evid.
801(e)(1)(B).  Under this rule, the prior
consistent statement of a witness is admissible to rebut an express or implied
charge of recent fabrication or improper influence or motive if the statement
was made before the motive to fabricate arose. 
Dowthitt v. State, 931 S.W.2d 244, 263 (Tex.Crim.App. 1996).  Appellant apparently concedes that the State
established the statements made to Ranger Hullum were consistent with H.B.=s testimony at trial, therefore, we
will confine our review accordingly.

Appellant argues
that at no point did he either imply or suggest that H.B. fabricated her
testimony as a result of her therapy sessions with her counselors.  On the contrary, Appellant argues that any
questions on cross-examination were Asimply
a repetition of [H.B.=s]
answers on direct.@  Further, Appellant argues that H.B.=s motive to lie arose prior to her
statements to Ranger Hullum.  The State
argues that Appellant=s
cross‑examination implied that H.B. had been improperly influenced by her
counselors which led her to fabricate portions of her statements and the trial
court was correct in allowing the statements made to Ranger Hullum.  We must agree with the State.








In this case, one
of the alleged improper influence/motives Appellant spent developing during
cross-examination of H.B. was that she may have been influenced as a result of
her therapy sessions.  We note specific
questions directed at H.B. during re-cross: 


Q:        You could open up more.  So what you=re
telling us today is that, as more and more people talked to you about it, would
talk with you about it, you=d
just start telling them more and more.

 

Q:        [H.B.,] you told the jury earlier that
it wasn=t until
you got into therapy that you started recalling and remembering and telling
people about acts of prior sexual misconduct by Zeke against you . . . . 

 

After reviewing the record of the
cross-examination and re-cross, it is clear to us that counsel for Appellant
attempted to demonstrate that H.B. began embellishing her story as a result of
therapy in an effort to cast doubt on her testimony.

A prior consistent
statement does not have to be made before all motives to fabricate or improper
influences arose.  See Dowthitt,
931 S.W.2d at 264.  Although there may be
any number of motives to fabricate in a given case, for the statement to be
admissible, it need only be introduced in response to one of those express or
implied charges of recent fabrication or improper influence or motive.  See id.  In this case, H.B.=s
statements to Ranger Hullum were made prior to an alleged improper influence, i.e.,
the therapy sessions.  Therefore, the
trial court did not abuse its discretion in allowing H.B.=s statements to Ranger Hullum to be
admitted as prior consistent statements. 
Issue Three is overruled.








In Issue Four,
Appellant argues that the trial court erred when it allowed the State to
introduce evidence of an extraneous offense allegedly committed by Appellant
approximately fourteen to fifteen years prior to the charged offense.  During the cross-examination of Appellant=s expert witness, Dr. Gold, the State
sought to question her about the alleged extraneous offense committed by
Appellant.  Appellant=s counsel objected to the evidence
being admitted arguing that the State had Aopened
the door@ and not
Appellant.  The trial court overruled
Appellant=s
objection and allowed the State to question Dr. Gold about an extraneous
offense involving improper conduct with Ms. Rechelle Garcia.

After the State
rested, Appellant called Officer Tulon Murphy of the Fort Stockton
Sherriff=s
Department to refute the alleged extraneous offense.  Officer Murphy testified that he was on duty
the night the alleged offense was committed. 
He stated that he and Appellant were at a local convenience store, the ATown and Country,@ at approximately 10 p.m. when Ms.
Garcia drove up and started talking to Appellant.  He stated that after she left, he and
Appellant went for a ride in Appellant=s
new patrol car.  At some point, Appellant
and Officer Murphy pulled off the interstate. 
They were sitting in the patrol car when Ms. Garcia arrived.

According to
Officer Murphy, after Ms. Garcia arrived, she got out of her car and approached
the patrol car.  Officer Murphy stated
that Appellant and Ms. Garcia then walked away from the patrol car and started
talking.  Officer Murphy testified that
Appellant was out of his sight for approximately ten minutes.  He stated that when Appellant and Ms. Garcia
returned to the car, he did not notice anything out of the ordinary.

After Appellant
rested, the State called Ms. Garcia to the stand to testify.  Appellant did not object to her
testimony.  She testified that Appellant
regularly came to the AComanche
Springs Truck Stop@ where
she worked the graveyard shift.  At the
time of the alleged incident, Ms. Garcia was seventeen years old.  On the night in question, Appellant told her
to follow him in his patrol car.  Ms.
Garcia followed Appellant to a darkly lit location on the Pecos Highway
.  








She testified that
the very next thing that she remembered was Appellant having her Apinned down on top of the car@ and kissing her Avery hard on [her] neck.@ 
She screamed for Appellant to stop and told him that her mother was
expecting her home and if she did not show up, her mother would call the
police.  Appellant began laughing and
told her that Ahe was
the police, who was she going to call.@  Eventually, Appellant stopped kissing her and
she left.  Ms. Garcia testified that
Officer Murphy was also present during the incident.  

Even assuming
Appellant is correct and the extraneous offense evidence was inadmissible,
Appellant waived his earlier objection when the same evidence was later
introduced without objection.  See
Leday v. State, 983 S.W.2d 713, 717-18 (Tex.Crim.App. 1998); Massey v.
State, 933 S.W.2d 141, 149 (Tex.Crim.App. 1996)(if a defendant objects to
admission of evidence but the same evidence is subsequently introduced from
another source without objection, defendant waives his earlier objection); see
also Howland v. State, 966 S.W.2d 98, 100‑01 (Tex.App.‑‑Houston
[1st Dist.] 1998), aff'd, 990 S.W.2d 274 (Tex.Crim.App. 1999)(waiver of
error in admitting doctor=s
testimony and reports about sexual acts performed on child victims where
defendant subsequently allowed victim to testify, without objection).  Therefore, any error that might have occurred
in initially admitting evidence of the extraneous offense was waived when
Appellant failed to object to the subsequent admission of the same
evidence.  Issue Four is overruled.








In Issue Five,
Appellant challenges the trial court=s
decision to transfer venue to Crockett
 County, Texas.  This case originated from the 83rd Judicial
District of Pecos County, Texas.  On March 20, 2002, the District Attorney Pro
Tem filed a motion to change venue under Tex.Code
Crim.Proc.Ann. art. 31.02 (Vernon
1989).  On August 7, 2002, the trial
court conducted a hearing on the merits of the change of venue motion.[5]  Both Appellant and the State called witnesses
and presented evidence at the hearing.

The trial court
ultimately denied the motion of the State. 
In addition to denying the motion to change venue, the trial court sent
a letter to each party informing them of its decision but indicating that Aif, during voir dire, the Court
determines that it is not possible to obtain a fair and impartial jury, the
Court will not hesitate to re-visit this issue.@  Subsequently, the State filed a supplemental
motion to transfer venue under Tex.Code
Crim.Proc.Ann. art. 31.02, which the trial court did not rule on.  The State then filed a second supplemental
motion to change venue citing Tex.Code
Crim.Proc.Ann. art. 31.01, which allows the court, on its own motion, to
change venue.  At a hearing held in
chambers, the State re-urged its motion to change venue.  The trial court heard arguments and
objections from the State and Appellant. 
Ultimately, the trial court decided to change the venue and entered an
order accordingly.








Appellant argues
that he was entitled to a second hearing prior to a change of venue under Tex.Code Crim.Proc.Ann. art.
31.01.  The State argues that Appellant
waived this issue because his objection at trial does not comport with his
complaint on appeal.  Appellant, in his
reply brief, argues that Aprior
to the entry of the October 29, 2004 Order, the trial court never informed the
parties whether it was transferring venue pursuant to Art. 31.01 or Art. 31.03
(sic).  Thus, defense counsel=s general objection that the
requirements to transfer venue under either Art. 31.01 or Art. 31.03 (sic)
preserved this issue for appellate review.@[6]

To preserve a
complaint for appellate review, a party must have first presented the complaint
to the trial court by timely request, objection, or motion.  Tex.R.App.P.
33.1(a)(1).  Further, the grounds for the
desired ruling from the trial court must be stated Awith
sufficient specificity to make the trial court aware of the complaint, unless
the specific grounds [are] apparent from the context.@  Tex.R.App.P.
33.1(a)(1)(A).  Although Appellant
objected to the change of venue on substantive grounds, he never raised the
issue of notice or lack of a hearing. 
Therefore, to the extent Appellant is complaining of either lack of
notice or a hearing, that portion of his argument is waived.

As for the
remainder of his complaint, we review a trial court=s
decision to transfer venue under an abuse of discretion standard.  Garcia v. State, 75 S.W.3d 493, 499
(Tex.App.‑-San Antonio 2002, pet. ref=d),
citing Brimage v. State, 918 S.W.2d 466, 508 (Tex.Crim.App.
1994).  Article 31.01 does not require
the trial court to present evidence in support of its own motion but only
offers the parties a chance to be heard on the matter.  Garcia, 75 S.W.3d at 499.  Because the trial court can Asatisfy itself from any cause@ that a fair trial cannot be had, a
court rarely abuses its discretion in deciding to transfer venue on its own
motion.  See Brimage, 918 S.W.2d
at 508.








In this case, the
trial court noted the extensive bias of the venire panel, stating Aat least every other member of the
remaining panel on initial voir dire had expressed a bias.  I quite frankly didn=t
expect to have a panel which clearly has so many individuals that have formed
an opinion . . . .@  The court also noted that of the remaining jurors,
many Astill
showed an unwillingness to serve because they just did not want to be placed in
a position of passing; judgment of a friend, or of some other relationship that
they may have had with this defendant.@  

In the order
transferring venue, the trial court indicated that it had reviewed the evidence
presented at the earlier hearing on the State=s
first motion to change venue, reviewed the pleadings and attachments, and had
presided over voir dire.  As a result,
the trial court was of the opinion that Adue
to the existing combination or influences in favor of the Defendant in Pecos
County, Texas, as well as the qualified prospective jurors= knowledge of the parties . . . a
trial, alike fair and impartial to the accused and to the State, cannot be had
in Pecos County, Texas.@  We find that the trial court did not abuse
its discretion in ordering a change of venue on its own motion.  Issue Five is overruled.

In Issue Six,
Appellant challenges the legal and factual sufficiency of the evidence.  Appellant first challenges the sufficiency of
the evidence supporting the finding that he acted with the requisite intent to
arouse or gratify his sexual desire. 
Appellant contends there was no corroborating physical evidence and that
Aguilt could not be inferred from
[Appellant=s]
conduct, remarks, or surrounding circumstances on September 10, 2001, or
thereafter.@  Additionally, Appellant argues A[t]he bulk of the State=s case against Appellant hinged on
[H.B.=s]
testimony at trial, her hearsay statements, and her credibility@ and A[t]he
record reveals that [H.B.] was simply not a credible witness.@








With regard to
Appellant=s legal
sufficiency complaint, the uncorroborated testimony of a child complainant is
sufficient to support a conviction under penal code Chapter 21.  Tex.Code
Crim.Proc.Ann. art. 38.07 (Vernon 2005); see also Jensen v. State,
66 S.W.3d 528, 534 (Tex.App.‑-Houston [14th Dist.] 2002, pet.
ref'd)(testimony of a victim, standing alone, even when the victim is a child,
is sufficient to support a conviction for sexual assault).  Indecency with a child is a Chapter 21 offense.  Viewing the evidence in the light most
favorable to the verdict, we conclude that a rational trier of fact could have
found beyond a reasonable doubt all the essential elements of the offense of
indecency with a child.  See Tex.Penal Code Ann. ' 21.11(a).  Thus, we find that H.B.=s 
testimony is legally sufficient to support Appellant=s conviction.  As to any issues regarding her credibility,
we will defer to the jury=s
assessment.  See Cain, 958 S.W.2d
at 408-09. 

As it relates to
Appellant=s factual
sufficiency complaint, we note the majority of evidence contrary to the verdict
consisted of the conflicting testimony of the witnesses and Appellant=s expert witness testimony regarding
her evaluation of Appellant.  The weight
to be given conflicting testimony lies within the sole province of the jury,
and the reviewing court must show deference to the jury=s
determination.  Cain, 958 S.W.2d
at 408‑09.  Additionally, Appellant
points to the lack of any corroborating physical evidence as support for his
sufficiency complaint.  However, lack of
physical evidence is merely a factor for a jury to consider in weighing the
evidence.  See Johnson v. State,
176 S.W.3d 74, 78 (Tex.App.‑-Houston [1st Dist.] 2004, pet. ref'd).  After a neutral review of all of the
evidence, we conclude that the evidence supporting the verdict is not too weak
to support the guilty finding beyond a reasonable doubt nor so contrary to the
verdict as to be clearly wrong and unjust.








In addition to his
general legal and factual sufficiency challenge, Appellant specifically argues
that the evidence was legally and factually insufficient to show beyond a
reasonable doubt that he acted with the intent to arouse or gratify his sexual
desire.  We disagree.  The conduct alone is sufficient to infer intent.  Wallace v. State, 52 S.W.3d 231, 235
(Tex.App.‑-El Paso 2001, no pet.). 
When the evidence is viewed in the light most favorable to the verdict,
we find that a rational trier of fact could have found beyond a reasonable
doubt that Appellant acted with the intent to arouse his sexual desire.

As for Appellant=s argument that the evidence is
factually insufficient to support the finding of intent to arouse or gratify
his sexual desire, Appellant does not point to any contradictory evidence, but
rather argues there is a complete lack of evidence to support the jury=s finding.  However, as previously stated, intent to
arouse may be inferred from Appellant=s
conduct, words, and all the surrounding circumstances.  Id.
at 234-35.  After viewing the evidence
presented in a neutral light, we conclude the evidence supporting the jury=s finding that Appellant touched H.B.
with the intent to arouse or gratify his own sexual desire is not so weak that
the verdict is clearly wrong and manifestly unjust nor was the contrary
evidence so strong that the standard of proof beyond a reasonable doubt could
not have been met.  We find that the
evidence was both legally and factually sufficient to sustain Appellant=s conviction.  Accordingly, Issue Six is overruled.

Having overruled
all of Appellant=s issues,
we affirm the trial court=s
judgment.

 

 

August
4, 2006

DAVID WELLINGTON
CHEW, Justice

 

Before McClure, J., Chew, J., and Guaderrama, Judge

Guaderrama, Judge (Sitting by Assignment)

 

(Do Not Publish)











[1]
Appellant was indicted in Pecos
 County in cause number
P-2525-83-CR.  The trial court
transferred venue to Crockett
 County and the case
proceeded under cause number 03-12-2253-CR. 
After judgment had been entered, the trial court entered an order
transferring the case back to Pecos
 County on July 8, 2004.





[2]
It is not clear from the record exactly how much time passed between the
incident and the arrival of Ms. Velasquez. 
However, the incident occurred shortly before Ms. Velasquez received the
first phone call at approximately 2:30 p.m. and Ms. Velasquez arrived home at
approximately 4:15 to 4:30 p.m. 
Appellant returned to the home after picking up the younger child at
approximately 5 p.m.  It was after her
arrival and prior to the arrival of Appellant when Ms. Velasquez spoke to her
daughter about the incident.





[3]
Father Herrera prepared notes after the incident and relied upon them
throughout his testimony at trial.





[4]
The existence of the videotaped interview was earlier referenced during the
questioning of Ranger David Hullum without objection.

 

Q:        Okay. 
To your knowledge, had [H.B.] given any other formal interviews
subsequent to your interview that you shared with us.

 

A:         Yes.  The Harmony Home
or advocacy center gave -- took a videotaped child victim interview.





[5]
Appellant indicates in his brief that the hearing of August 7, 2002 was not
made a part of the appellate record. 
However, we have the full record of the hearing conducted by the trial
court.





[6]
At the hearing held in chambers, the trial court informed the parties that it Ais going to, on its own motion, order a
change of venue.@