Terry N. STERLING, Appellant,

v.

The STATE of Texas, Appellee.

No. 69484.

Court of Criminal Appeals of Texas, En Banc.

May 9, 1990.

Rehearing Overruled Dec. 19, 1990.

**514**

Nevill Manning (court appointed), Lubbock, Thomas E. Tollett (court appointed), Littlefield, Charles E. Benson, on appeal only, Lubbock, for appellant.

Curtis R. Wilkinson, County Atty., & Margaret R. Ingle, Asst. County Atty., Littlefield, Robert Huttash, State's Atty., Austin, for State.

## OPINION

WHITE, Judge.

This is an appeal from a conviction for capital murder, specifically murder in the course of committing or attempting to commit aggravated sexual assault. See V.T. C.A., Penal Code Sec. 19.03(a)(2). Appellant was sentenced to death. He brings four points of error on appeal. After due consideration of appellant's claims, we affirm the judgment of the trial court.

Although appellant has not raised a sufficiency of the evidence claim, a brief review of the facts is in order. Della M. Thomas was an eighty year old widow who lived alone in Amherst, Texas. On July 30, 1984, she and her sister Annie M. Brown made plans to go to Lubbock the next day to visit sick relatives. On the morning of July 31, Thomas failed to show up at Brown's house as planned and Brown was unable to reach Thomas by phone. Brown proceeded to her sister's house to see what had gone wrong.

When Brown arrived, Thomas' garage door was up, as it usually was during the day. However, the door from the garage into the kitchen was unlatched, which was highly unusual. Brown stepped into the kitchen and called for her sister. Receiving no reply, she began to search the house. When she reached Thomas' bedroom, she found Thomas' body unclothed from the waist down, sprawled across the bed. Thomas's dentures, which she always wore when she slept, were strewn on the nearby floor. An apparent struggle between Thomas and her assailant had bloodied the area. Wounds had been inflicted on Thomas' face, the middle of her back, her neck, her hands, and her arms; there were approximately twenty-three stab wounds to her chest alone. The immediate cause of death was later determined to have been a knife blow through the heart. Physical evidence also indicated that Thomas had been raped during the attack.

After discovering her sister's body, Brown immediately called Dr. J.W. Chatwell, Thomas' physician and nearby neighbor. He quickly summoned an ambulance, and left the local hospital to assist at the scene. Law enforcement personnel and a Justice of the Peace also were summoned. All witnesses including Brown testified that nothing appeared to be out of place or missing from the house. A slash was discovered in the screen door leading from the

garage to the kitchen, and a fingerprint, later identified as appellant's, was found on the door.

Law enforcement officials traced a knife found underneath Thomas' body to Roberta Cantu, appellant's great-grandmother, with whom he lived. The only other members of the household were Cantu's aged husband and appellant's younger brother Michael, who was eleven at that time. Cantu identified the knife as hers, stating that she had been using it the night before in the kitchen and that it had been missing all day. She testified that appellant had not been home the night before when she went to bed, but that he had been there when she had arisen that morning.

A warrant was then issued for appellant's arrest. Late on the afternoon of July 31, DPS Trooper Larry Northcutt spotted appellant in a field northeast of Amherst. Northcutt arrested appellant and took him to a nearby abandoned house in order to release him into the custody of Lamb County Sheriff's Deputy Livingston and Texas Ranger Jackie Peoples, who had also been engaged in the search for appellant. When Ranger Peoples assumed custody at the house, he read appellant his *Miranda* rights. Appellant indicated that he understood his rights. He was then taken to the Lamb County Jail in Littlefield.

At the jail, Officer Peoples interviewed appellant and obtained a signed, written confession which will hereinafter be referred to as the "Peoples confession" or the "first confession." Other officers were present at the beginning of the interview, including Deputy Livingston, who once again informed appellant of his rights pursuant to *Miranda* and Art. 38.22, V.A.C. C.P. However, these officers soon left Ranger Peoples alone with appellant. Ranger Peoples testified that he then told appellant that "they might go easy" on him if he made a statement and that a statement could be used "for or against" him. The ranger also told appellant that he faced a possible penalty of five to ninety-nine years in prison, life imprisonment, or the death penalty. At the time, appellant had been charged with murder, but the possibility of capital murder was still being investigated. Appellant said that he understood everything the ranger was telling him. At no time did he ask to speak to a lawyer or to have a lawyer appointed for him. The substance of appellant's confession resulting from this interview was as follows:

"State of Texas, County of Lamb, I, Terry Nash Sterling, have been first duly warned by Jackie Peoples, Texas Ranger, at 7:10 p.m. on the 31st day of July, 1984, at Sheriff's Department in Littlefield", Texas, of the following rights. Number one, I have the right to remain silent and not make any statement at all and that any statement I make may be used against me at my trial; Number two, Any statement I make may be used as evidence against me in court; Number three, I have the right to have a lawyer present to advise me prior to and during any questioning; Number four, If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning; and, Number five, I have the right to terminate the interview at any time.

I have read the above rights and have had the same explained to me and do knowingly, intelligently, and voluntarily waive the rights as set out above. I do hereby freely and voluntarily, without being induced by any compulsion, threats, promises or persuasion, make the following statement in writing:

My name is Terry Nash Sterling, and I am twenty-five years of age. I was born in Amherst, Texas, and at present, I consider the following address my home, 109 Washington Street, Amherst, Texas;

T.S. Henry Miles and I were together in Amherst and then went to the Stan Simmons farm and cut some posts. We left the farm and mixed some Seagram Seven and coke and drove to Sudan. We went to Dale Ray Jefferson's house in Sudan. We then rode around for a long time in Sudan and Dale Ray was with us. We were still drinking. We then decided to go home and stopped at Allsups in Sudan and bought something to eat. We

then went to Amherst and Henry took me home and he drove away. This was about 2:30 a.m.

I went to bed and tried to go to sleep but the bed got to spinning. I got up and went o-t (sic) bathroom and to the kitchen and got a drink of water. I tried to go back to sleep and couldn't, so I got back up and went outside. I went back into the house and got the kitchen knife. I believe it was white. I went back outside and started walking.

I walked on Washington Street and started back home. Something told me to go home but I went to the next street. As I was walking back, I looked at this house and the garage door was open. I walked into the garage and cut the screen door and unlocked it. The inner door was unlocked and I walked in. I walked into the living area and down the hall. There were no lights on in the house.

I walked into the bedroom. Down beside the bed next to the windows, the lady was in the bed and I cut her. She fought me a little bit. I don't remember how many times I cut her. She was on the floor and I put her back in the bed. I had sex with her and then left and went home.

I burned my shirt and pants, washed my socks and shoes, and left my underwear on. T.S.

I have read this statement consisting of one page, each of which bears my signature, and I affirm that all the facts and statements contained herein are true and correct. I further affirm that I knowingly, intelligently, and voluntarily waived the above rights prior to and during the making of this statement.

Witness my hand this 31st day of July, A.D. 1984, at 7:10 p.m. Signed Terry M. (sic) Sterling.

Witnesses: Peggy B. Hayes, signed, Jackie Peoples signed.

After he made this statement, appellant was returned to his jail cell.

Early in the morning of the next day, August 1, 1984, appellant was taken before Justice of the Peace Cox for the standard magisterial appearance. Again, he was warned of his *Miranda* and 38.22 rights (this was at least the third time he was correctly warned of his rights). Appellant initialed the Judge's form indicating that he understood his rights; again, he made no request of any kind for counsel.

After appellant had eaten breakfast and lunch, he was taken before Lamb County Sheriff McNeese for questioning. Before this interview, appellant was again correctly warned of his rights (a fourth time) by Deputy Livingston. Sheriff McNeese then obtained a written waiver of rights from appellant, and a second written confession, (the "McNeese Confession" or the "second confession.") The Sheriff testified that he made appellant no promises of any kind in exchange for this confession, that he did not discuss the first confession with appellant, and that his motive for seeking a second confession was to get a more detailed story. The Sheriff's testimony indicated that he knew nothing about Ranger Peoples' earlier statements to the effect that "they might go easy" on appellant if he talked or that a statement could be used "for or against" appellant. Before appellant signed his second confession, he initialed each of the written *Miranda* warnings, indicating that he understood them. The substance of appellant's second confession was as follows:

"Number one, I have the right to remain silent and not make any statement at all and that any statement I make may be used against me at my trial; Number two, Any statement I make may be used as evidence against me in court; Number three, I have the right to have a lawyer present to advise me prior to and during any questioning; Number four, If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning; and, Number five, I have the right to terminate the interview at any time.

. . . . .

I have read the above rights and have had the same explained to me and do knowingly, intelligently and voluntarily waive the rights as set out above. I do

hereby freely and voluntarily, without being induced by any compulsion, threats, promises or persuasion, make the following statement in writing:

My name is Terry Nash Sterling, and I am twenty-five years of age. I was born in Amherst, Texas, and at present I consider the following address my home, 109 Washington Street, Amherst, Texas.

We went to Alsups at 1:55 or 2:00 a.m. in Sudan, Texas, and I was with Henry J. Miles. When we got to Amherst, he took me home and I got out and he went back home. I went into the house and I went straight to bed. I laid there about ten or fifteen minutes and I got up and went outside to get some air and I went back into the h-o-s-e and tried to go back to sleep, but couldn't so I went to the bathroom and then went to the kitchen to get a drink of water. I went to the sink and seen the knife and I grabbed it and went back outside. I left from the house and walked on Washington Street and nearly got all the way down and I turned back around and started home and I looked across the street and Mrs. Thomas' garage door was already open. Something told me to go on home instead of going there, but I went across there anyway. When I got there, I cut the screen and I stuck my hand and unlocked the hook. I opened the door. The wooden door was not locked. I went on in.

When I went in, I went into the dining room, the living room, and I went down the hall. I looked in the first room and there was nothing there. I looked into the second room and when I looked into the third room, she was there, which I was just going to rob her. She woke up and everything, which I wasn't intended to kill her or anything like that. She started hollering and she was trying to fight back. When I stabbed her, she fell on the floor, and I put her back on the bed. I had sexual intercourse with her. When I left, I walked back to the house and went back to bed. Before I had intercourse with her, she was fighting me and I cut her in the hands. I stabbed her several times before I had intercourse with her. I placed her on the bed

face down. I left and went back home. I was in Mrs. Thomas' house about thirty or thirty-five minutes. I had intercourse with her just one time. I did not take anything from her house. I went out the same door that I came in when I left her house.

When I got ready to leave, I was trying to find the knife and couldn't. I suppose she was laying on the knife. The reason that I could not find the knife is that I had laid her on the bed on the knife. I went out the same door as I came in. When I left there, I went home, and when I got, I took off my clothes and put some more on. (sic) I took the clothes that I had on, balled them up, and took them outside and put them into the trash can and burned them. I burned them because I did not want to leave any evidence. I washed my shoes and socks. I hung them on the clothes line.

This all happened in Amherst, Lamb County, Texas. This happened on the early hours of July 31st, 1984. I also understand I could be charged with capital murder.

I have read this statement consisting of one page, each of which bears my signature, and I affirm that all the facts and statements contained herein are true and correct. I further affirm that I knowingly, intelligently, and voluntarily waived the above rights prior to and during the making of this statement."

Certain details from the second confession were corroborated by other evidence. Deputies found ashes in the trash can behind appellant's residence which could have come from burned clothing. His employer and friends corroborated appellant's account of his whereabouts and activities on the night before the murder, including his drinking. Finally, his great-grandmother testified that appellant had asked her for some laundry detergent on the morning after the murder.

At some time while in the Lamb County Jail, appellant made a third admission to cellmate Ritchie Schroeder. The record does not indicate whether this happened

before the McNeese confession or afterwards. However, this statement will be referred to as the "third statement", or the "Schroeder admission." At trial, Schroeder testified that the appellant stated that he had broken into the victim's house to "get some things" but that she had scared him and he had then killed her.

Objections to the admissibility of appellant's first two confessions were properly preserved at trial.

After indictment and appointment of counsel, appellant properly raised the question of incompetency to stand trial. Pursuant to Sec. 3, Art. 46.02, V.A.C.C.P., the trial court issued an order appointing Rusk State Hospital and the professional staff thereof as experts for the purposes of determining appellant's competency to stand trial and evaluating appellant's sanity. The court order specified that the Rusk examiners should comply with all the provisions of Arts. 46.02 and 46.03, V.A.C.C.P. As part of a battery of standardized tests, appellant was given an IQ test known as the Wechsler Adult Intelligence Scale–Revised (the "WAIS–R test"). His overall score on this test was 69, which, according to the accompanying manual from the test's creators, placed appellant in the "mentally retarded" category (defined as any score below 70). Because of his score on this test, appellant met one of the three criteria for "mental retardation" under the Mentally Retarded Persons Act, Art. 5547–300, Tex.Rev.Civ.Stat.Ann. (Vernon Supp. 1989). The staff at Rusk did not give appellant specialized examinations designed to indicate whether he met the other two statutory criteria of mental retardation; they concluded instead, based on a variety of physical and psychological tests and interviews, that appellant was not functioning in the mentally retarded range despite his test score. They also concluded that he was competent to stand trial and sane.

Dr. James Hunter from Rusk testified at appellant's competency hearing. Appellant objected to his testimony, alleging that deficiencies in the retardation evaluation at Rusk rendered Dr. Hunter incompetent to testify. The objection was overruled, and a jury found appellant competent to stand trial.

Appellant's first two points of error are best treated together. These points complain about the admission of the two detailed confessions—the "Peoples confession" made on July 31, 1984, and the "McNeese confession" made on August 1, 1984. Appellant argues that the Peoples confession should have been excluded and gives at least eight reasons in support of his contention. This first point of error is multifarious, with the relationships between the eight different theories left ambiguous and with no argument or authorities to support most of the contentions. The only contention clearly presented and supported with arguments and authorities is that appellant's first confession was inadmissible under *Dunn v. State*, 721 S.W.2d 325 (Tex.Cr.App.1986). Appellant's second point of error asserts that the taint surrounding the first confession rendered the second confession also inadmissible. We agree that the trial court erred in admitting the Peoples confession, but we hold that error harmless in light of the proper admission of the subsequent McNeese confession containing substantially the same evidence and the third statement to cellmate Schroeder.

In *Dunn*, the defendant was told that a statement sought by his interrogator could be used "for or against him." *Id.* at 339. This Court held that

> if the evidence is uncontroverted and uncontradicted that the person who takes or obtains a written confession from the accused tells the accused that his confession might be used "for or against him," or "for and against him," then this renders the confession inadmissible evidence at trial because the warning does not comply with our State confession statute, which is presently Art. 38.22, V.A.C.C.P., and such may not be admitted at trial over objection.

*Id.* at 341.

*Dunn* is squarely on point with the facts of this case. Ranger Peoples testified that he told appellant that a statement could be used "for or against him" and that "they

might go easy on him" if he confessed. These statements rendered the Peoples confession inadmissible because it violated Art. 38.22, V.A.C.C.P.

*Coursey v. State,* 457 S.W.2d 565 (Tex. Cr.App.1970), cited by the State, is quite distinguishable from this case. In *Coursey,* a police officer apparently became confused on the stand when he testified that the County Attorney had told a suspect that a statement could be used "against him, or for him." The officer immediately thereafter clarified his testimony by stating that "it was the preliminary warning we give on all statements." When asked if he meant that the warning given was the one contained on the standard confession form, the officer answered "[y]es, sir," and he reiterated this answer after examining a copy of the form. *Id.* at 567. Finally, at a State habeas corpus hearing occurring before the appeal, the County Attorney himself had testified to the correct administration of the statutory warning. In the light of all this controverting testimony, we held that the officer's initial testimony had been, in effect, corrected. *Id.* at 568. We also noted, in overruling Coursey's appellate claim, that he had failed to object to the admissibility of the confession at trial. *Id.*

In this case Ranger Peoples was alone with appellant during most of the conversation resulting in appellant's first confession. His testimony concerning the improper statements he made is uncontroverted, and error was preserved at trial. *Coursey* is simply inapplicable.

We now turn to an examination of the admissibility of appellant's second confession, made to Sheriff McNeese on August 1. Appellant's sole complaint with regard to this confession is that it also was tainted by Ranger Peoples' improper inducements. Using an analysis guided by *Bell v. State,* 724 S.W.2d 780 (Tex.Cr.App. 1986), we find that the taint from Peoples' statements was sufficiently attenuated to permit admission of the second confession.

In the *Bell* case, defendant's first confession was ruled inadmissible under the Fourth Amendment as the fruit of an illegal arrest. *Id.* at 791. The arrest was illegal only because the police had failed to obtain a warrant. Therefore, when the police did obtain the required warrant before defendant's second confession, the causal link between the illegal arrest and the second confession was severed. *Id.* Thus, the Fourth Amendment issue was summarily dispatched.

The court then undertook a Fifth Amendment analysis in order to determine whether the first confession's inadmissibility tainted the latter confession. Borrowing from *Holleman v. Duckworth,* 700 F.2d 391, 396 (7th Cir.1983), we enumerated several factors to be considered when determining whether a former confession's illegality tainted a later one:

(1) did the condition rendering the first confession inadmissible persist through later questioning,

(2) how long was the break in time between the two confessions,

(3) was the defendant given renewed *Miranda* warnings,

(4) did defendant initiate the police interview which resulted in the later confession, and

(5) "any other relevant circumstances".

*Bell,* 724 S.W.2d at 792, quoting *Holleman,* 700 F.2d at 396. "Other relevant circumstances" considered in *Bell* included

(6) was the defendant taken before a magistrate to be warned of his rights between confessions,

(7) was there particular evidence that defendant's latter confession was motivated by a desire to exculpate himself, rather than by any earlier improper influences brought to bear on him,

(8) did the defendant remain in custody between the confessions,

(9) did the defendant confer with counsel between confessions, or make any kind of request for counsel, and

(10) was there particular evidence to suggest that defendant was motivated by "cat out of the bag" thinking—i.e. that he gave the second confession when he

otherwise might not have *because* he had already given the first one. *Bell*, 724 S.W.2d at 792–793.

An examination of the factors above and all "other relevant circumstances" indicates that appellant's second confession was not tainted by his first one. *See also Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Griffin v. State*, 765 S.W.2d 422 (Tex.Cr.App.1989).

Sheriff McNeese, in eliciting the second confession, made no promises to appellant. The Sheriff was a different interrogator from a different law enforcement agency. He said nothing like "it might go easier for you" or "this statement could be used for or against you." An entire day had passed since appellant's first confession, giving appellant time to eat, drink, and reflect on his situation. An intervening appearance before Justice of the Peace Cox had occurred. Appellant had been correctly informed of his rights at least twice between interviews, once by Judge Cox and a second time before the McNeese interview. Before appellant signed the McNeese confession, he was again warned of his rights; he stated at that time that he understood them, and he wrote his initials in front of each written warning on the confession form. Sheriff McNeese did not question appellant about the earlier confession nor did he use this confession to elicit the latter confession from appellant. Finally, we note that there was some evidence that appellant's second confession may have been motivated by a desire to exculpate himself, since he included the self-serving statements "I was just going to rob her" and "I wasn't intended to kill her or anything like that" (sic), which were not in his first confession.

■ Appellant contends that the taint from the first statement could not have been dissipated without an express repudiation of Ranger Peoples' earlier inducements. In the case at bar, Sheriff McNeese testified that he was totally unaware of anything that had been said to appellant, by anyone, before the Peoples confession was made. We do not believe the Sheriff had an obligation to conduct an inquest into all previous conversations between appellant and other law enforcement officials before conducting his own interview.

■ If, however, there is a situation where a suspect has invoked any of his *Miranda* rights, knowledge of the invocation must be imputed to all representatives of the State in order to preserve the efficacy of the suspect's rights. *See Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). Such is not the case here, since appellant invoked none of his rights before Ranger Peoples, Magistrate Cox, or Sheriff McNeese.

Weighing all the factors concerning the attenuation of the taint from the first confession, we hold that the trial court committed no error in admitting the McNeese confession. Appellant's second point of error is overruled.

■ We also overrule appellant's first point of error because we find the error resulting from the improper admission of the Peoples' confession to be harmless in light of the second admissible confession containing substantially the same facts, *Bell*, 724 S.W.2d at 793, *Daniel v. State*, 668 S.W.2d 390, 392 (Tex.Cr.App.1984), and also in light of the independent evidence of guilt in this case: the statement to cellmate Schroeder, the appellant's fingerprint on the victim's screen door, and the appellant's great-grandmother's knife found under the victim.

■ Appellant's third point of error complains generally that the failure to take appellant before a magistrate "without unnecessary delay," combined with the magistrate's failure to inform appellant of his rights pursuant to Article 15.17, V.A.C.C.P. "in clear language" as that statute requires, along with the magistrate's failure to immediately inquire as to appellant's indigency and failure to appoint trial counsel until 25 days after indictment denied appellant his Federal and State rights to counsel and denied him due course and due process of law. Appellant made no objections of any kind at trial which even remotely comport with this multifarious point of error.

Generally, error must be presented at trial with a timely and specific objection, and any objection at trial which differs from the complaint on appeal preserves nothing for review. *Granviel v. State*, 552 S.W.2d 107, 121 (Tex.Cr.App.1976); cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Hinkle v. State*, 442 S.W.2d 728, 732–33 (Tex.Cr.App.1969); *Hodge v. State*, 631 S.W.2d 754, 757 (Tex.Cr.App.1982); *Williams v. State*, 549 S.W.2d 183, 187 (Tex.Cr.App.1977). Also, by combining more than one contention in a single point of error, an appellant risks rejection on the ground that nothing will be presented for review. *Cuevas v. State*, 742 S.W.2d 331 (Tex.Cr.App.1987); *Thomas, infra.* Because appellant preserved nothing for review at trial, we overrule point of error number three.

Appellant's fourth point of error is very broad, actually combining several allegations. While such a point of error runs the risk of presenting nothing for review, *Thomas v. State*, 723 S.W.2d 696, 97 (Tex. Cr.App.1986) at n. 2, we will, in the interest of judicial economy and justice, address appellant's claims.

■ Appellant's first claim is that the professional staff of Rusk State Hospital, because employed by the State, could not be "disinterested experts" within the meaning of Art. 46.02, sec. 3(a), V.A.C.C.P. As such, he claims that the members of the professional staff of Rusk were not qualified to testify at appellant's competency hearing, and that the testimony given so prejudiced his competency hearing and trial on the merits as to deny him due process of law.

■ The qualification of a witness to testify as an expert is a determination which rests largely within the discretion of the trial court. *Steve v. State*, 614 S.W.2d 137, 139 (Tex.Cr.App.1981); *Bueno v. State*, 501 S.W.2d 339, 341 (Tex.Cr.App. 1973). The trial court's decision will not be disturbed on appeal absent a clear showing of abuse of discretion. *Id.*

No such abuse of discretion has been shown. Although we agree that the purpose of Article 46.02, V.A.C.C.P. is to provide for a disinterested expert to assist the trial court in assessing competency to stand trial, *Debolt v. State*, 604 S.W.2d 164 (Tex.Cr.App.1980), appellant has failed to show that the Rusk staff was biased. Appellant points out that Rusk staff members are employed by the State of Texas, but this does not, as a matter of law, mean that they cannot be "disinterested witnesses" within the meaning of Article 46.02. *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr.App. 1978); cert. denied, 441 U.S. 967, 99 S.Ct. 2418, 60 L.Ed.2d 1073 (1979), reh. denied, 444 U.S. 888, 100 S.Ct. 190, 62 L.Ed.2d 123 (1979).

In *Von Byrd*, the defendant made a similar complaint about the disinterestedness of the Rusk staff, particularly directed toward Dr. James Hunter, a psychiatrist at Rusk who is Clinical Director of the Maximum Security Unit. Because there was nothing in the record to show bias other than Dr. Hunter's employment with the State, we construed Von Byrd's claim to be that all experts in the employ of the State would not be "disinterested" and hence would be disqualified as a matter of law from appointment under Article 46.02, sec. 3(a). We expressly disavowed this notion.

■ Although *Von Byrd* disposes of the disinterestedness issue, we do not even reach that issue in the case at bar. Appellant's claim is that the failure of the Rusk staff to be "disinterested" disqualified Dr. Hunter from testifying as an expert at appellant's competency hearing. Dr. Hunter did not need to be "disinterested" within the meaning of Art. 46.02, V.A.C.C.P., in order to testify at the competency hearing; the proper predicate for his testimony is found in *Holloway v. State*, 613 S.W.2d 497, 501 (Tex.Cr.App.1981):

> ... whether the subject in issue is one upon which expert opinion would assist the jury and, if so, whether the proffered witness possesses the requisite qualifications are preliminary questions for the trial court to decide ... it must be shown that [the witness] possesses special knowledge upon the specific matter about which his expertise is sought ...

what is determinative is that his answers indicate to the trial court that he possesses knowledge which will assist the jury in making inferences regarding fact issues more effectively than the jury could do unaided.

*See also* Tex.R.Crim.Ev. 702–704. (effective after the trial of this case).

Dr. Hunter testified that he was Clinical Director of the Maximum Security Unit at Rusk State Hospital. At the time of the competency hearing, he had been at Rusk for almost eighteen years. He had graduated from the University of Texas Medical Branch at Galveston in 1940 and had spent twenty-six years on active duty as a commissioned officer with the United States Public Health Service. He had temporarily acted as the superintendent of Rusk on several occasions. He had taught at seminars for psychiatrists involving the issues of sanity and competency. He often examined defendants for competency assessments and testified to his findings frequently. With respect to appellant, he had personally examined him twice at Rusk, and was acquainted with all of the psychological and physiological tests performed on appellant by his staff. Considering Dr. Hunter's professional background and familiarity with appellant's condition, we certainly cannot say that the trial court abused its discretion in permitting Dr. Hunter to testify on the issue of appellant's competency to stand trial.

 Appellant's fourth point of error also encompasses a claim that Articles 46.-02 and 46.03 were not fully complied with, as specified in the order for competency and sanity evaluations at Rusk, and that admission of Dr. Hunter's testimony at the competency hearing therefore violates due process.[1] Appellant contends that Sec. 3(d)(2) of Art. 46.02 and Sec. 3(d)(2) of Art. 46.03 mandate a comprehensive diagnosis and evaluation of whether appellant is "mentally retarded" as that term is defined in the Mentally Retarded Persons Act, *supra*, especially in light of appellant's I.Q. score and birth history. Because a more comprehensive retardation analysis was not performed, appellant contends that Dr. Hunter should not have been allowed to testify at the competency hearing.

Whether the testing or reporting requirements of Articles 46.02 or 46.03 were complied with is irrelevant to a determination of whether the trial court abused its discretion in permitting the testimony.[2] A judge has discretion to permit an expert witness to testify according to the standards set forth in *Holloway, supra*. In light of Dr. Hunter's qualification set forth above, we cannot say that the trial court abused its discretion.

Point of error four is overruled.

Having overruled all four of appellant's points of error, we affirm the judgment of the trial court.

CLINTON, J., concurs in the result

TEAGUE, J., dissents for the reasons expressed in this Court's opinion in *Dunn v. State*, 721 S.W.2d 325 (Tex.Cr.App.1986), also see *Connor v. State*, 773 S.W.2d 13–15 (Tex.Cr.App.1989), and because admitting into evidence over objection an involuntary confession cannot ever be harmless error to the defendant.

STURNS, J., not participating

---

1. Appellant uses the term "due process" under both the Federal and State Constitutions. The proper term for the Texas constitutional analogue to federal due process is "due course of law." Article I, Sec. 19, Texas Constitution.

2. We do note, however, that the Rusk staff did make the competency and sanity evaluations and sent the required report back to the trial court.