

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOS. PD-1154-19, 1155-19, 1156-19

### THE STATE OF TEXAS

### v.

### KEVIN CASTANEDANIETO, Appellee

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### DALLAS COUNTY

**KELLER, P.J., delivered the opinion for a unanimous Court.**

The trial court suppressed statements made by Appellee during a police interview. The court of appeals affirmed that decision on a legal theory not presented to the trial court. Appellee's legal theories involved whether he understood warnings that were given at the beginning of the interview and whether the State interfered with his Sixth Amendment right to counsel. The court of appeals's legal theory was that statements in a prior interview were obtained through coercion and that caused his statements in the second interview to be involuntary. We conclude that the court of appeals's theory was not a theory of law applicable to the case because the State was not given an opportunity to develop a complete factual record with respect to that theory. Consequently, we reverse the

judgment of the court of appeals and remand the case to it for further proceedings.

## I. BACKGROUND

### A. The Interviews

### 1. *First Police Interview*

Appellee was arrested for aggravated robbery in the early morning hours of August 10, 2017. At the time of arrest, Appellee was eighteen years old and had emigrated from El Salvador five years earlier. Shortly after arrest, around 3:00 a.m., he was interviewed by Detective Thayer.[1] This interview was video recorded.[2] During the first several minutes of the interview, the detective elicited personal information from Appellee and conveyed warnings pursuant to *Miranda*[3] and Article 38.22[4]:

| | |
|---|---|
| DETECTIVE: | I've been working on this case. Kind of a mess, huh? Kind of a mess. We'll talk about it here in a minute. Let me just find out a few things about you. Where are you from? |
| APPELLEE: | Where am I from? |
| DETECTIVE: | Mhmm. |
| APPELLEE: | I'm from El Salvador. |
| DETECTIVE: | From where? |
| APPELLEE: | El Salvador. |

---

[1] We have not found a reference to Detective Thayer's first name in the record.

[2] The record includes electronic copies of the interviews, but it does not include a transcription.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[4] TEX. CODE CRIM. PROC. art. 38.22.

DETECTIVE:     You said San Salvador?

APPELLEE:      Where I'm born?

DETECTIVE:     Yeah, where were you born?

APPELLEE:      In El Salvador.

DETECTIVE:     Okay and when did you come here?

APPELLEE:      5 years ago.

DETECTIVE:     5 years ago?  Take your arms out of your shirt for me.

APPELLEE:      Sorry, it's 'cause it's cold.

DETECTIVE:     It's ok.  It's a respect thing though right?  Because we're going to have a conversation and we're going to be truthful with each other.  So you came over here 5 years ago, did you come with family?

APPELLEE:      No I just came by myself, because my mom married to my step-dad and then my step-dad asked for me.  So they fix the papers for me and I came here.

DETECTIVE:     So you are how old?

APPELLEE:      18.

DETECTIVE:     18, so you came here 5 years ago.  Did you go to school?

APPELLEE:      Yes, sir.

DETECTIVE:     Did you graduate?

APPELLEE:      *Shakes head no*

DETECTIVE:     Didn't graduate?

APPELLEE:      No, almost.

DETECTIVE:     What about a job?  Do you have a job?

APPELLEE:      I used to work on air conditioners.

DETECTIVE:     On air conditioners?  Who did you work with?

APPELLEE:      Um, quality.

DETECTIVE:     Okay, so do you have a job now?

APPELLEE:      Not right now.

DETECTIVE:     Not right now, okay.  How about brothers and sisters?

APPELLEE:      I just got one sister.

DETECTIVE:     One sister?

APPELLEE:      She's not here.

DETECTIVE:     She's back—

APPELLEE:      She's in Salvador.

DETECTIVE:     Who do you live with?

APPELLEE:      I was living with my grandma in Garland.

DETECTIVE:     Your grandma in Garland?  What's her name?

APPELLEE:      Yolanda.

DETECTIVE:     Yolanda?

APPELLEE:      Yeah.

DETECTIVE:     Do you know the address?

APPELLEE:      No, because she already moved from Garland.  I don't know where she lives.

DETECTIVE:     You don't know where she moved to?

APPELLEE:      No.

DETECTIVE: So you lived with her but you don't—

APPELLEE: No, because we was living with my uncle, me, my two cousins, and my gran. And she moved, so I just lived with my uncle.

DETECTIVE: So do you stay with your uncle now?

APPELLEE: Mhmm.

DETECTIVE: Where does he stay at? Garland?

APPELLEE: Yes.

DETECTIVE: What's the address?

APPELLEE: I don't know the address, but he lives off of Walnut Street.

DETECTIVE: Walnut Street? Walnut Hill or Walnut Street?

APPELLEE: Walnut Street.

DETECTIVE: Walnut Street. Okay. Well before I can talk to you about what happened tonight, I have to read you your rights. Do you watch TV at all? Like cop shows or—

APPELLEE: Yeah.

DETECTIVE: Okay. Well I'm going to read these to you. You have the right to remain silent and not make any statement at all, and any statement you make may be used against you at your trial. Any statement you make may be used as evidence against you in court. You have the right to have a lawyer present to advise you prior to and during any questioning. If you're unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning. And you have the right to terminate the interview at any time. Do you understand the rights I have read to you?

APPELLEE: *Shakes hand so/so*

DETECTIVE: A little bit? Okay—Well are you—

APPELLEE: It's just 'cause I don't speak a lot of English.

| | |
|---|---|
| DETECTIVE: | Can you read Spanish? |
| APPELLEE: | Yes. |
| DETECTIVE: | Okay, read that for me and tell me if you understand. |
| APPELLEE: | [Reads rights out loud in Spanish] |
| DETECTIVE: | Okay, do you understand? |
| APPELLEE: | *Nods affirmatively* |
| DETECTIVE: | Okay. Are you willing to talk to me— |
| APPELLEE: | Um— |
| DETECTIVE | —and try to figure this all out? |
| APPELLEE: | It's 'cause—um—I don't understand. |
| DETECTIVE: | Okay, let's talk about what happened tonight. |
| APPELLEE: | Yes, sir. |
| DETECTIVE: | Okay. You know you're in some trouble, huh? |
| APPELLEE: | I know. |
| DETECTIVE: | You know. You made some bad decisions tonight. |
| APPELLEE: | That's because, um, I don't know why I did that. |
| DETECTIVE: | You don't know why you did it? |
| APPELLEE: | It's because—Let me tell you the truth. |
| DETECTIVE: | Okay. That's good, tell me the truth. |

Detective Thayer and Appellee then proceeded with the rest of the interview. During the interview, Appellee mentioned being "fucked up" because he was "doing drugs." When asked what kind of drugs, Appellee responded, "weed and cocaine." When asked how long ago he had used

cocaine, Appellee asked what time it was, and when told it was almost four in the morning, responded that he used cocaine at "eleven."

### 2. *Arraignment*

That evening, Appellee was brought before a magistrate for arraignment. According to the arraignment sheet, the magistrate informed Appellee of a number of rights and warnings, including those required by *Miranda*:

> I have in clear language informed the person arrested of the accusation against him and of any Affidavit filed herewith, and of his right to retain counsel, and of his right to the appointment of counsel if he is indigent and cannot afford counsel, and of his right to remain silent, and of his right to have an attorney present during any interview with peace officers or attorneys representing the State, and of his right to terminate the interview at any time, and of his right to have an examining trial. I informed the person arrested that he does not have to make any statement at all, and that any statement made by him may be used in evidence against him on his trial for the offense concerning which the statement is made. I informed the person arrested that reasonable time and opportunity would be allowed him to consult counsel and of his rights to bail if allowed by law. I also informed the person arrested that if he is not a citizen of the United States that he may have the right to contact consular officials from his country and that if he is a citizen of certain countries that consular officials would would be notified of this arrest without further action required on his part.[5]

When asked whether he wanted an appointed lawyer, Appellee informed the magistrate that he did.[6]

### 3. *Second Police Interview*

The next evening, August 11, Detective Olegario Garcia went to the jail and asked Appellee if he would come to police headquarters for an interview. Appellee agreed. Detective Garcia

---

[5] The record indicates that the magistrate notified the El Salvador consulate of the charges against Appellee.

[6] The next day Appellee was appointed an attorney, but that attorney declined representation. Three days later, Appellee was appointed the attorney who represented him at the motion to suppress hearing.

brought food from McDonald's and left Appellee in the interrogation room to eat before the interview started. When the detective came back, he joked that Appellee was eating the burger slowly. Appellee responded, "It's probably the last hamburger I'm going to eat. I hope not, but I don't know." Detective Garcia responded, "It will not be the last hamburger you eat man, so don't worry about that. Alright, just want to get some basic stuff out of the way."

Detective Garcia then began by eliciting basic identifying information (name, address, date of birth), asking about family members, and inquiring about life in El Salvador. Then he turned to the subject of answering questions, and conveyed warnings required by *Miranda* and Article 38.22:

| | |
|---|---|
| DETECTIVE: | Alright, basically we're going to go over everything that you talked about with the other Detective and now that you've had a couple days to think about stuff maybe you might remember something that you didn't or you might have some questions of your own for me that I'll try to answer, okay? If I don't know the answer, I'll tell you. And if I do, you know I'll be honest with you and give you the information. Okay? |
| APPELLEE: | I'm gonna do the same, ask me anything you want. I'll tell you, I'm going to tell you the truth. |
| DETECTIVE: | Alright, [the other detective] read this to you. But everybody who comes in here, we read this to you. You have the right to remain silent and not make any statement at all and any statement you make may be used against you at your trial. Any statement you make may be used against you as evidence in court. You have the right to have a lawyer present to advise you prior to and during any questioning. If you're not able to employ a lawyer you have the right to have a lawyer appointed to you to advise you prior to or during any questioning, and you have the right to terminate the interview at any time. Do you understand the rights I read to you? |
| APPELLEE: | Yes, sir. |
| DETECTIVE: | Alright, are you willing to talk to me about, basically going over everything? |

APPELLEE: Yeah, I'm gonna tell you—I'm gonna start by basically saying what it was I was doing.

Detective Garcia and Appellee then proceeded with the rest of the interview.

### B. Motion to Suppress

#### 1. *Written Pleading*

Defense counsel filed an omnibus pretrial motion, which included the following sentence: "Defendant requests a hearing prior to the introduction of any statements allegedly made by the Defendant, either orally or in writing, to determine the admissibility of same. TEX. CODE CRIM. PROC. ANN. article 38.22, 38.23."

#### 2. *Defense Counsel's Initial Oral Claims*

At the suppression hearing, defense counsel initially claimed that the statements from the first interview should be suppressed because Appellee "didn't demonstrate a full awareness of the rights he was waiving and [the] meaning of the waiver of those rights." As for the statements from the second interview, counsel stated that "we carry 1 over to number 2, but additional grounds for number 2 is the State reinitiated contact, not the defendant, and therefore" the statements from the second interview were inadmissible.

#### 3. *State's Witness*

The State responded that it sought to admit only the statements from the second interview. In support of its position, the State called Detective Garcia, the sole live witness at the suppression hearing. The prosecutor asked him if he had "any issues communicating" with Appellee between the jail and police headquarters. Detective Garcia answered, "No." When asked what he did to make sure the two of them understood each other in the interview room, the detective responded that

he did so by "just getting basic information," such as name and address and other common information to "break the ice" and build rapport. When asked whether any of his questions were designed to help him understand Appellee's education level and language skills, Detective Garcia answered affirmatively and said, "He was able to spell the street that he lived on. His pronunciation seemed well. I personally don't speak Spanish at all, so I was able to understand everything he was saying." When asked if Appellee ever switched to Spanish, the detective responded, "No."

Turning specifically to the recorded interview, the prosecutor asked the detective if he ever had any concerns that Appellee was not understanding him. Detective Garcia answered, "No, I felt like he understood what I was saying." When asked if that was based on "language, education level, mental acuity," the detective responded that it "seemed like he understood what I was saying, was able to respond properly to the questions I was asking. He had an understanding of slang words, you know. I think that showed me he was ingrained into the culture here in the United States." When asked for an example of the slang Appellee used, Detective Garcia noted that Appellee used the word "strap" to describe a gun. Detective Garcia further testified that he read *Miranda* warnings to Appellee and that these warnings were verbatim from a card. The detective further stated that, when he finished reading the warnings, he asked Appellee if he understood the rights that were read, and Appellee responded, "Yes," and nodded his head. The detective also testified that he asked Appellee if he was willing to talk to him, and Appellee said he was willing to and started talking about what happened.

The prosecutor then asked if the detective ever promised Appellee anything in exchange for his statement. Detective Garcia responded, "No." A few questions later, the prosecutor asked, "[D]id you threaten him in any way or coerce him in any way to talk to you about both the offenses

that you were investigating and the offenses he'd already been arrested for?" Again, Detective Garcia answered, "No." The prosecutor followed up: "Did it seem, based on your communication with him, that he was voluntary—voluntarily telling you all of these things?" Detective Garcia responded, "Correct." The prosecutor also asked if the detective talked to Appellee about "making any kind of deal down the road or making a call on his behalf or anything like that," and Detective Garcia responded, "No."

After Detective Garcia finished testifying, the State tendered the Court's file, which included the arraignment forms.

### 4. *Defense's Case*

After the State rested, defense counsel had the first four minutes of the first interview played for the trial court. After the video segment was played, the following colloquy occurred:

| | |
|---|---|
| [DEFENSE COUNSEL]: | Can we stop it there? Can we back up to 3:37:45 and play to 51 again? Judge, this is where the defendant says he doesn't—it's not the language barrier. It's where he doesn't understand his rights. |
| THE COURT: | Okay. |
| [PROSECUTOR]: | Can I start it there? |
| [DEFENSE COUNSEL]: | That's fine. Yeah, that's fine. (Video playing.) |
| THE COURT: | He said he didn't—"I don't understand." |
| [DEFENSE COUNSEL]: | He says, "I don't understand." We can stop it there. I rest. |
| THE COURT: | Okay. The question was, "You want to talk to me?" "I don't understand." |
| [DEFENSE COUNSEL]: | Yes, sir. |

[PROSECUTOR]: The question actually was, "You willing to talk to me and try to figure this all out?" He says, "It's because I do not understand."

THE COURT: "Because I do not understand."

[DEFENSE COUNSEL]: Does not understand.

THE COURT: Uses the word "because"?

[PROSECUTOR]: He says, "It's 'cause."

THE COURT: "It's 'cause."

[PROSECUTOR]: After the question, "Do you understand?" Then he nods in the affirmative. Then it's the "figure out" part.

THE COURT: Okay.

[DEFENSE COUNSEL]: And we rest, Judge.

THE COURT: Okay.

[PROSECUTOR]: State closes.

[DEFENSE COUNSEL]: And we close.

### 5. *Defense's Suppression-Hearing Argument*

Defense counsel began his argument to the trial court by saying, "We're not talking about a language barrier. We're talking about whether or not the defendant understands his rights and the consequences of waiving them." Defense counsel then suggested that, in the first interview, Appellee did not know English well enough to understand his *Miranda* rights and to intelligently waive them:

> After the rights are read in English, he indicates that he doesn't understand English well enough to go over the legal parts, and so the officer has him read the card in Spanish, which he does." When he reads the card in Spanish, the officer proceeds

and asks him if he understands. The defendant clearly, when he refers to, "I don't understand," is referring to the waiver of his rights and the consequences of waiving them. And under *Moran vs. Burbine*, that is a lack of awareness of–you can't waive your rights if you don't have a full awareness of the nature of the right being abandoned and the consequences of doing so. . . . We have him expressing he doesn't understand. . . . In this case, the defendant expressed the fact that he did not understand the rights that he was waiving. . . . Judge Richter wrote the opinion saying that you have to have an unequivocal expression of a waiver under the amendment. And in this case, the defendant did say he didn't understand, so that's factually different.

Defense counsel then contended that this lack of understanding necessarily carried over to the second interview:

> Now, that applies to the second confession in the following way: My client didn't gain an understanding of what he was doing under the Constitution in the intervening hours between confession 1 and confession 2. So the Miranda warnings given by the second detective don't cure the problem that we had from the first.

Defense counsel also claimed that the statements in the second interview were inadmissible because Appellee asked for an appointed attorney at his arraignment (which occurred between the two interviews), and the police reinitiated contact with him in violation of the *Sixth* Amendment right to counsel:

> We also move to suppress the confession because this confession was taken after my client was arraigned on all of the robberies that were discussed. . . . My client, when he was arraigned, expressed that he wanted a lawyer. He checked the box, said, Yes, I do want a court appointed lawyer. At the time he was arraigned, that's a critical stage of the prosecution. . . . The rationale for this is that once the right to counsel attaches under the Sixth Amendment, the defendant's afforded more protections because now he's expressing the idea that, I do not want to deal with the State any further except through counsel. Because the entire equation has now been changed. He's not—no longer under investigation. He has now been charged and brought over and arraigned. And he asks for a lawyer, and a lawyer was appointed. The reason we go to the trouble of appointing a lawyer right away is so the Sixth Amendment rights attach. This is no longer just a Fifth Amendment problem. Now it's a Sixth Amendment problem. . . . Under the circumstances we have, the police cannot reinitiate contact with the defendant after he has been interviewed and after he has been arraigned and appointed a lawyer. The second interrogation took place after [an

attorney[7]] was appointed, after the critical stage had begun. And they just can't do that.

Summing up his claims, defense counsel stated, "And we request that you suppress the second confession on those two bases. Number 1, it was made without full awareness, which is the fruit of the poisonous tree from the first interrogation; and number 2, because the Sixth Amendment was clearly violated in attaining this second confession."

### 6. *State's Suppression-Hearing Argument*

The prosecutor first argued that Appellee's responses in the second interview showed that he understood his rights:

> I'll address the first issue with regard to the defendant's motion under 38.22 and 38.23. First, Your Honor, with regard to whether or not the statement was given voluntarily, as you could see from the statement in question, the one and the only one we are trying to admit as evidence in this case, we are talking about when the officer read to him his *Miranda* warnings, his response to, "Do you understand the rights I have read to you" was a nod of his head in the affirmative and to say, "yes." That, as he pointed out, Justice Richter has found in the past to be unequivocal. And he did at that point voluntarily waive his rights and agree to speak with counsel—or excuse me, agree to speak with the detective. . . . Once again he does confirm by nodding his head and saying yes, that he does understand those rights.

The prosecutor also pointed out that, in addition to being informed of his rights in the first interview, Appellee was also informed, a second time, at the arraignment by a magistrate. And the prosecutor also contrasted the conditions of the first and second interview to explain how Appellee's understanding of his rights could have differed at those two times:

> Your Honor, he was brought in to custody August 10th in the wee hours of the morning. And you saw from his statement on August 11th that he had been drinking for a week, that he had been smoking marijuana, that he had been partaking in cocaine for the first time. So any of his statements or what—where his mental state was when he was given the rights in English and again in Spanish have no bearing

---

[7] This was the attorney who declined representation.

on what he understood when he was given those rights 48 hours later after a long period of sobriety in the jail. So we believe that to the first point, Kevin Castaneda-Nieto, when he sat down voluntarily with the detective on August llth, did understand his rights, did knowingly waive those rights and did agree to speak voluntarily. Understanding that he did have the right to say, "I want my lawyer to be with me," understanding that he did have the right to remain silent and understanding that he could have ended that at any point in time, knowing those rights, he waived those rights and agreed to speak with the detective voluntarily.

The prosecutor and the defense also argued back and forth on the claim that a Sixth Amendment right-to-counsel violation had occurred because the police reinitiated contact with the defendant after he had requested counsel at arraignment.

### 7. *Trial Court's Ruling and Reconsideration*

The trial court granted the motion to suppress. The State filed a motion for reconsideration on the basis of *Montejo v. Louisiana*.[8] The State's argument was that *Montejo* defeats Appellee's Sixth Amendment claim. The trial court granted reconsideration to hear the State's argument. Defense counsel argued that the case did not apply because state caselaw still applied and statutory law (Article 38.22) was stricter than the Sixth Amendment. The trial court reaffirmed its original ruling granting the motion to suppress.

### C. Appeal

The court of appeals concluded that the trial court could have based its suppression ruling "in part on the continued behavior of law enforcement figures declaring to [Appellee] that he would speak to them in the interrogation setting."[9] The appellate court found that the evidence supported an inference that two declarative statements made by Detective Thayer in the first interview "set the

---

[8] 556 U.S. 778 (2009).

[9] *State v. Castanedanieto*, ___ S.W.3d ___, Nos. 05-18-00870-CR, 05-18-00871-CR, 05-18-00872-CR, 2019 Tex. App. LEXIS 8884, *7 (Tex. App.—Dallas October 3, 2019).

tone for an expectation that [Appellee] would speak to authorities that overbore [Appellee's] will and made his statements involuntary."[10] The court of appeals characterized Detective Thayer as "going through the motion of providing Miranda warnings in English and Spanish."[11] The court found that Appellee expressed hesitation about his rights by acts and words, and it criticized Detective Thayer for failing to elicit any verbal or nonverbal assent from Appellee to waiving his *Miranda* rights.[12]

The court of appeals also concluded that Detective Garcia, though to a lesser extent, "declared" to Appellee that he would talk.[13] The court further found it significant that Detective Garcia reminded Appellee of the prior interrogation and confession, "suggesting he may have more to tell the second time around."[14] The court of appeals found this reference to give the trial court sufficient basis to conclude that Appellee's confession "was motivated, if only in part, by so-called cat-out-of-the-bag thinking."[15]

The court of appeals then discussed *Sterling v. State*,[16] which set forth factors to be considered when determining whether an earlier confession's illegality tainted a later confession.[17]

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.* at *7-8.

[15] *Id.* at *8.

[16] 800 S.W.2d 513 (Tex. Crim. App. 1990).

[17] *Castanedanieto*, 2019 Tex. App. LEXIS 8884 at 8-10.

The court of appeals contrasted the present case with *Sterling* by pointing out that Sterling's motion to suppress was denied by the trial court but Appellee's was granted.[18] The court of appeals emphasized that the trial court had wide discretion and concluded that the videos of the interviews did not contain indisputable evidence contrary to the exercise of that discretion.[19] And focusing on the video of the second interview, the court of appeals said that nothing in it demonstrated that Appellee "was not under the influence of the detectives' declarations that he would speak to them or that he was not motivated at least in part by cat-out-of-the-bag thinking."[20]

The court of appeals also noted the Supreme Court case of *Oregon v. Elstad*,[21] which held that there was no presumption that an earlier confession taken without *Miranda* warnings would cause a later confession in compliance with *Miranda* to become involuntary.[22] But the court concluded that *Elstad* did not change the appellate court's job to review the trial court's ruling for an abuse of discretion and that the case did not require an appellate court to "reweigh the facts in a way that may warrant a conclusion that denying the motion was possible."[23]

Concluding that the trial court did not abuse its discretion in granting the motion to suppress, the court of appeals affirmed.[24]

---

[18] *Id.* at *9-10.

[19] *Id.* at *10-11.

[20] *Id.* at *11.

[21] 470 U.S. 298 (1985).

[22] *Castanedanieto*, 2019 Tex. App. LEXIS 8884 at *11-12.

[23] *Id.* at *12.

[24] *Id.*

## II. ANALYSIS

### A. The Issue Here

Defense counsel presented the trial court with two legal theories for suppressing the statements from the second interview: (1) that Appellee did not understand the *Miranda*/Article 38.22 warnings in the first interview and that this lack of understanding carried over to the second interview, and (2) that the State violated Appellee's Sixth Amendment right to counsel by reinitiating questioning after Appellee had requested appointed counsel at arraignment. But the court of appeals did not address either of these theories. Instead, the appellate court upheld suppression of the evidence on a third, unargued theory ("coercion" theory): that Appellee's will was overborne by declarative statements made by the detective in the first interview and that this coercion carried over to the second interview based at least in part on the fact that the "cat was out of the bag" (because he had incriminated himself in the first interview).

In its first ground for review, the State contends that this "coercion" theory was not a theory of law applicable to the case because the State did not have the opportunity to litigate it before the trial court.[25] Appellee responds that the State litigated the coercion theory before the trial court when it asked Detective Garcia whether he threatened Appellee at the second interview and whether the statements in that interview were voluntary. The State also raises claims about the *Sterling* factors and video as indisputable evidence, but as we shall see, these claims are subsumed or mooted in our

---

[25] This ground reads: "Under the *Calloway* rule, is police coercion of a confession a 'theory of law applicable to the case' where the appellee argues that he lacked a 'full understanding' of his *Miranda* rights in a different statement?"

discussion.[26]

## B. The *Calloway* Rule

The "*Calloway* rule" dictates that a claim of reversible error on direct appeal should be rejected if the trial court's ruling is correct "on any theory of law applicable to the case" even if "the trial court did not purport to rely on that theory" and the prevailing party did not explicitly raise the theory.[27] But courts have resisted employing the *Calloway* rule "when to do so would work a manifest injustice" to the party appealing.[28] While a legal theory can support a trial court's ruling even if not explicitly raised or relied upon, the theory must in some basic way be "a theory of law applicable to the case." A legal theory is not applicable to the case if the appealing party did not have an adequate opportunity to develop a complete factual record with respect to the theory.[29] The question in this case, then, is whether the State had an adequate opportunity to develop a complete

---

[26] The State's second ground reads: "In reviewing a trial court's ruling on a motion to suppress, the reviewing court must give deference to the trial court's resolution of the facts and review de novo the legal significance of those facts. May the court of appeals infer that a confession is involuntary as a matter of fact instead of applying the relevant legal test to the facts supported by the record?" The State's third ground reads: "In deferring to the trial court's implied resolution of the facts, must the court of appeals ignore indisputable video evidence that the defendant affirmatively waived his *Miranda* rights?" In connection with these grounds, the State contends that the court of appeals failed to properly apply the *Sterling* factors to determine whether the taint of the first interview was attenuated for the second interview, and the State contends that the court of appeals ignored indisputable video evidence from the video of the second interview. Appellee responds that the *Sterling* factors are not exclusive, that the court of appeals implicitly considered at least some of them, that lack of attenuation can be decided as a matter of fact and not just law, and that the video evidence of the second interview is not indisputable because it must be examined in light of the first interview.

[27] *State v. Esparza*, 413 S.W.3d 81, 85-86 (Tex. Crim. App. 2013).

[28] *Id.* at 89.

[29] *Id.* at 90.

factual record with respect to the coercion theory relied upon by the court of appeals.

### C. Did the Defendant's Theories Give the State an Adequate Opportunity to Develop a Complete Factual Record on the Unraised Coercion Theory?

We first address whether the defendant's legal theories at the suppression hearing gave the State an adequate opportunity to develop a complete factual record on the coercion theory. Because we can most easily dispense with the Sixth Amendment theory, we address it first. Appellee's claim was that his Sixth Amendment right to counsel attached at arraignment and that this right was interfered with when Detective Garcia initiated the second interview, which occurred after arraignment. For this claim, arraignment was the key event, and nothing that occurred before arraignment was relevant.[30] The first interview occurred before arraignment. Because the coercion theory depends on a finding of coercion at the first interview, and the first interview had no relevance at all to the Sixth Amendment claim, the Sixth Amendment claim did not put the State on notice of the need to develop facts that would ultimately be relevant to the coercion theory.[31]

Next, we turn to the claim that Appellee did not understand the warnings that were given pursuant to *Miranda* and Article 38.22. Although that claim was based on what occurred at the first interview, there is a significant factual difference between not understanding one's rights and being

---

[30] *See Texas v. Cobb*, 532 U.S. 162, 167-68 (2001) ("The Sixth Amendment right [to counsel] . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.") (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)) (bracketed material and ellipsis in *Cobb*).

[31] Because the court of appeals did not address Appellee's Sixth Amendment claim, we have no occasion to address it or to discuss the State's reliance on *Montejo*.

coerced into making a statement.[32] And these factual scenarios need not align. A person could understand his rights with perfect clarity and still be coerced. Conversely, a person could give a statement with complete volition but not understand his rights.

Moreover, a finding of coercion carries more far-reaching consequences for later statements than a finding of noncompliance with *Miranda* or Article 38.22.[33] If a statement is coerced, then later statements are presumptively the fruit of the poisonous tree and are admissible only if the taint has been shown to be attenuated.[34] By contrast, a failure to comply with *Miranda* in a prior interview gives rise to no such presumption and ordinarily does not bar statements made in a subsequent interview that does comply with *Miranda*.[35] The only exception is when the police engage in a two-step interrogation technique "in a calculated way to undermine the Miranda warning."[36] Likewise, Article 38.22 simply prescribes the conditions that must be met for a particular statement to be admissible; the failure of a statement to satisfy its conditions does not give rise to an independent illegality that would render inadmissible a later statement that complies with

---

[32] *See Elstad*, 470 U.S. at 312 ("There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question.").

[33] *Id.*

[34] *See Elstad*, 470 U.S. at 317-18.

[35] *Elstad*, 470 U.S. at 314. *See also Contreras v. State*, 312 S.W.3d 566, 582-83 & nn.59, 60 (2010) ("The failure to observe those practices—give warnings, honor warnings, etc.—is not itself a constitutional violation, but the admission, in certain circumstances, of a statement that was taken without observing those practices is.") (holding Art. 38.23 inapplicable to *Miranda* violations, citing *Elstad*).

[36] *Carter v. State*, 309 S.W.3d 31, 38-39 (Tex. Crim. App. 2010) (discussing *Missouri v. Seibert*, 542 U.S. 600 (2004)).

the statute.[37]  In the *Miranda* and Article 38.22 contexts, a prior non-compliant statement does not taint a later compliant statement, so there is no occasion to conduct an attenuation analysis.[38]

Although it is true that Appellee claimed that the statements in the second interview were a fruit of the poisonous tree and that the lack of knowledge in the first interview carried over to the second interview, his legal theories were of the sort that do not involve a traditional "taint" analysis. The State's focus on the second interview and its decision to introduce only Detective Garcia's testimony was consistent with a belief that the State would not have to address a taint flowing from the earlier statement.  But in relying partially on a "cat out of the bag" theory, the court of appeals used a "taint" analysis.[39]

Even if Appellee's allegation of carry-over should have given the State some incentive to introduce evidence from Detective Thayer regarding the circumstances surrounding the first interview, that incentive was largely blunted by other factors.  First, as we have just discussed, in assessing compliance with *Miranda* or Article 38.22, an interview typically stands on its own. Second, the record as it stood provided an obvious explanation for concluding that there was no carry-over of any confused mental state on Appellee's part from first interview to the next.  The first

---

[37] *See Davidson v. State*, 25 S.W.3d 183, 186 n.4 (Tex. Crim. App. 2000) ("[A]rt. 38.22 merely prescribes the various requirements that must be satisfied before a statement made by an accused as a result of custodial interrogation will be admitted against him/her at trial. That such requirements are not met does not mean that the statement was necessarily obtained as a result of any legal or constitutional violation, and art. 38.22 mandates exclusion of such statements by its own terms and without reference to art. 38.23."); *Thai Ngoc Nguyen v. State*, 292 S.W.3d 671, 676-77 (Tex. Crim. App. 2009) (quoting from *Davidson*).

[38]  *See supra* at nn.35, 37.

[39]  *See Elstad*, 470 U.S. at 302; *United States v. Bayer*, 331 U.S. 532, 540-41 (1947); *Sterling*, 800 S.W.2d at 519-20.

interview occurred in the wee hours of the morning after Appellee had used drugs. The second interview occurred almost two days later, in the evening, after Appellee had eaten. Third, Appellee's rights had been explained to him previously by a magistrate. The second interview would have been the third occasion for Appellee to hear his rights and the second one to do so after having the opportunity to sleep and have the effects of drugs wear off. We need not and do not decide whether the State would prevail against Appellee's lack-of-understanding claim. We observe only that the State had every reason to believe its position was strong without having to produce witnesses relevant to the voluntariness of Appellee's participation in the first interview.

That would all change if Appellee's claim had been that Detective Thayer coerced his participation in the first interview. Coercion would carry a presumptive taint that the State would have to show was attenuated. The State would have had a good reason to try to establish that no coercion occurred in the first place, and to do that, the State would need witnesses who could speak to the circumstances surrounding the first interview. The State's incentive to call Detective Thayer would have been significantly stronger. Also, the State might have wanted to proffer testimony about Appellee's arrest, which occurred much closer in time to the first interview than to the second. And because coercion implicates a taint analysis, the State would have had at least some incentive to explore in greater detail any intervening circumstances that occurred between the first and second interviews, such as Appellee's appearance at arraignment.

Given all of these factors, we conclude that defense counsel's claims at the motion to suppress hearing did not afford the State an adequate opportunity to develop a complete factual record on the coercion theory.

### C. Did the State Raise the Coercion Theory so as to Create

**an Adequate Opportunity to Develop a Complete Factual Record**?

Appellee contends, however, that the State raised the coercion theory through Detective Garcia's testimony. More specifically, Appellee contends that the coercion theory was raised when the prosecutor elicited testimony from the detective that he did not threaten Appellee and that Appellee's statements appeared to be voluntary. It is true that the prosecutor elicited this testimony from Detective Garcia. For that matter, the prosecutor also elicited testimony that the detective did not promise Appellee anything in exchange for his statement and did not discuss or make any deals with him.[40]

All of this is the sort of testimony that prosecutors commonly elicit when a confession is being challenged as impermissibly extracted, regardless of the precise nature of the defendant's claim.[41] It would be questionable to rely upon this testimony to create defense theories of law applicable to the case when the defense attorney did not purport to dispute or controvert this testimony at the hearing. When the State puts on an officer who testifies that he did not coerce the defendant, and the defense makes no effort, through argument or evidence, to controvert the accuracy of that statement, a reasonable inference is that the defense is satisfied with that aspect of the State's testimony and is not in fact raising a challenge to it. Appellee's defense attorney never once suggested in his argument to the trial court that Appellee was coerced into participating in either of the interviews, nor did the defense present any testimony that explicitly suggested that.

The court of appeals relied on what it deemed to be "declarative" statements by the officers

---

[40] We refer to the testimony about promises, in addition to testimony about coercion, for illustrative purposes only and do not suggest that these issues are necessarily intertwined.

[41] This practice seems especially understandable when the State is the first party to present evidence at the suppression hearing—as occurred here.

in the interviews, as depicted by the videos. These statements are, at best, evidence from which coercion might be inferred. Even if such an inference is something the trial court could ultimately rely upon, if the issue were otherwise raised, it hardly seems to be a clear communication to the State that its witness's testimony of "no coercion" is being controverted. Perhaps in an appropriate case, an officer's statements in an interview video could be blatant enough that an inference of coercion would be immediately self-evident. The statements in the present case do not rise to that level.

In any event, the court of appeals's holding depends on a conclusion that the *first* interview was coercive. Detective Garcia did not testify about the first interview. He did not say that the first interview was not coercive. He only testified about the *second* interview. Even if his testimony about the second interview could raise coercion as a theory of law applicable to the case, it would not raise it as to the first interview. Consequently, Detective Garcia's testimony did not place the State on notice that it needed to develop a complete factual record on whether coercion occurred at the first interview.

### D. Conclusion

The court of appeals resolved the appeal on a coercion theory that was not a theory of law applicable to the case. The court of appeals has not addressed the theories of law that Applicant presented to the trial court. The State's first ground for review is sustained. The State's two remaining grounds, regarding the *Sterling* attenuation factors and the conclusiveness of video evidence, involve issues that might not even apply the same way to the types of claims the court of appeals needs to resolve. Any resolution of the State's two remaining grounds would be premature, so we decline to address them at this time.

We reverse the judgment of the court of appeals and remand the case for further proceedings consistent with this opinion.

Delivered: September 16, 2020

Publish